**AMERICAN PELAGIC FISHING COMPANY, L.P. Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–119C.

United States Court of Federal Claims.

March 18, 2003.

Laurie Frost Wilson, Lorton, VA, Stephen A. Saltzburg, Washington, D.C. for plaintiff.

James H. Holl, III, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, argued for defendant. With him on the briefs were Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, and Deborah A. Bynum, Assistant Director.

## OPINION

BRUGGINK, Judge.

American Pelagic Fishing Company ("APFC") brings this action pursuant to the Takings Clause of the Fifth Amendment. Liability was previously determined in favor of plaintiff in *American Pelagic Fishing Co., LP v. United States,* 49 Fed.Cl. 36 (2001) ("*American Pelagic I* "). Familiarity with the facts set out in that opinion is assumed. Trial on damages was held in Washington, D.C. on December 2–11, 2002. For the reasons set out below, we accept, with some adjustments, plaintiff's proof of required compensation.

## PROCEDURAL HISTORY

Plaintiff, APFC, is a limited partnership, wholly owned by Lisa Torgersen. At one time, the primary asset of APFC was a fishing vessel, the *Atlantic Star.* Currently, its primary asset is the rights to this litigation. Plaintiff filed this action on March 9, 1999, alleging that Congress had effected a complete, temporary regulatory taking of the use of the *Atlantic Star* when it adopted legislation on three occasions, effectively idling the vessel for the period from November 1997 to July 6, 1999. Plaintiff's motion for summary judgment on liability was granted on April 4, 2001, in *American Pelagic I,* 49 Fed.Cl. 36. We applied a *Penn Central* test and held that the legislation took all valuable use of plaintiff's boat within the meaning of the Takings Clause. We determined that Congress' targeted and retroactive revocation of plaintiff's permits effected a loss, not simply of the permits, but of all use of plaintiff's vessel.

On January 28, 2002 defendant sought leave to file an amended answer and assert an affirmative defense and counterclaim based on fraud in connection with the flagging of the vessel. The court denied that motion in *American Pelagic Fishing Co., LP v. United States,* 52 Fed.Cl. 341 (2002) ("*American Pelagic II* "). We held that the government had no evidence that the *Atlantic Star* had been improperly flagged. Nor did defendant bring forward any evidence that Mrs. Torgersen had "knowingly or recklessly [made] false statements with intent to deceive." *Id.* at 343 (citing *Daff v. United States,* 31 Fed.Cl. 682, 688 (1994)). Further, defendant did not give an excuse for its delay in bringing this affirmative defense two months before trial. What remains is for the court to determine the nature and amount of plaintiff's damage, if any.

## BACKGROUND

Before going into the particulars of the evidence, the court observes that it has rarely seen a greater contrast in the quality and

competence of opposing sets of witnesses. Unlike defendant's witnesses, plaintiff's witnesses were uniformly straightforward, highly qualified, and, with the exception of the Torgersens, disinterested.

### 1. Beginning the Atlantic Star Project

Lisa Torgersen is the President and sole shareholder of APFC. She put herself through undergraduate and graduate school working in the Alaskan salmon industry. Mrs. Torgersen worked as a crew member on salmon fishing boats during the summers from 1981 to 1989. Her specializations in school were international business and the Japanese language. After she received her masters degree in 1989, Mrs. Torgersen began to work full time for Birting Fisheries, Inc. ("BFI") in Seattle. For two years she continued as a crew member aboard salmon fishing vessels owned by BFI. In 1991, Mrs. Torgersen became the manager for a large factory trawler in Alaska, the Ocean Rover.[1] Mrs. Torgersen continued to work for BFI as its Operations Manager and later became the Operations/Sales Manager. BFI owned one large factory trawler and managed two others.

Later, Mrs. Torgersen went to New Zealand to manage two fishing vessels. During this time, Mrs. Torgersen married Harold Torgersen. Harold Torgersen is a Norwegian citizen whose family fished for herring, mackerel, capelin, and blue whiting. His father pioneered the herring and mackerel industry in Norway. Mr. Torgersen worked with his father's business every summer while growing up. In 1973, Mr. Torgersen began working on his father's fishing vessels full time. The vessels were purse seine combined trawlers.[2] In 1986, his family sold its vessels. In 1988, Mr. Torgersen formed American Seafood, with two partners, for the purpose of exploiting the Alaskan fisheries. American Seafood purchased vessels in the United States and converted them into factory trawlers.

Although Mr. Torgersen had never been in Alaska, he was in charge of the technical aspects and design of vessels for American Seafood. Once converted into factory trawlers, American Seafood vessels became the highest producing vessels in Alaskan waters. In 1993, Mr. Torgersen sold his interest in American Seafood. He joined a research venture in Chile, fishing for blue whiting. After selling his stake in that venture, Mr. Torgersen managed eleven Russian vessels in Russian waters. He managed vessels of similar size and capacity to the Atlantic Star, staying out at sea for as long as six months. In short, Mr. Torgersen is one of the most successful commercial fishermen in the world. Mr. Torgersen eventually ended these activities to help his wife pursue the possibility of a vessel for the East Coast. In early 1996 BFI was sold. Mrs. Torgersen began to hear about the opportunities available on the East Coast of the United States. Mrs. Torgersen left BFI and began to investigate the possibility of a vessel of her own.

### a. Herring and Mackerel in the Western Atlantic

The National Marine Fisheries Service ("NMFS") was in the midst of a campaign to encourage American fishing vessels to exploit the high levels of herring and mackerel stocks in the western Atlantic, as Mrs. Torgersen was researching the possibility of her own vessel. The agency considered these fish stocks to be seriously underutilized. NMFS's statements about underutilization of the pelagic species[3] were discussed in our earlier opinion, American Pelagic I, 49 Fed. Cl. at 38. Additionally, the Mid–Atlantic Fishery Management Council published documents which outlined the need for vessels of greater size in order to participate in the

---

1. A trawler is a vessel, like the Atlantic Star, which tows a net for harvesting fish. A factory trawler has the ability to clean, fillet, freeze and pack fish.

2. A purse seine vessel uses a fishing seine net to surround the fish. The net hangs vertically, drawn down by weights on one side and held up by floats on the other. It is then pulled together around the fish. A trawl net, in contrast, is towed behind the boat for several hours in order to catch fish. A combination vessel has the capability to use each type of net.

3. Pelagic fish are those fish whose habitat is above the floor of the ocean. Here, plaintiff was going to fish for two pelagic species, Atlantic herring, and Atlantic mackerel.

world market for herring and mackerel. Plaintiff's witnesses confirmed that in 1997, the East Coast of America was the best, least exploited, fishing opportunity in the world.

NMFS sets quotas for the United States fisheries. The quotas have a direct relationship to the amount of fish available in United States waters. There was virtually no competition in the herring and mackerel industry off the East Coast. At the time Mrs. Torgersen was doing her research, only 15 to 20 percent of what was then the quotas for Atlantic herring and mackerel were being caught. The Rhode Island Seafood Council reported to NOAA in 1998 that there was no danger of overfishing mackerel in this area. In fact, the report noted that it was probable that the mortality rate of the Atlantic mackerel was greater than the catch each year.

In her research, Mrs. Torgersen became aware of these opportunities. She then began to research specifically the viability of entering the western Atlantic waters with a large fishing vessel outfitted for harvesting mackerel and herring. She relied on the International Trade Commission's ("ITC") study, "Mackerel: Competitiveness of the U.S. Industry in Domestic and Foreign Markets." The study confirmed that mackerel fisheries were underutilized in the United States. It reasoned that due to a lack of economies of scale, the smaller American vessels fishing in the western Atlantic could not compete with the European vessels in terms of quality, transportation and marketing. The study concluded that larger fishing vessels would offer economies of scale and allow the United States Atlantic mackerel industry to compete internationally.

Capt. Michael Genovese testified for defendant. He captains a fishing vessel, the *White Dove Too*, in the western Atlantic. He took the view that the ITC studies were overly optimistic, based on his own difficulty locating mackerel. Capt. Genovese reasoned that mackerel were not present, because he often could not find fish. Additionally, he intimated that the government statistics were based on data which was inaccurately gathered. Neither he nor any other government witness furnished any details or explanation of these purported inaccuracies. The court gives little weight to his suspicions. He displayed a firm conviction that it would be impossible to fish in any manner better than the traditional one already employed off of the East Coast. Yet, Capt. Genovese showed a complete lack of knowledge about vessels of the same size and capacity as the *Atlantic Star*. He made no attempt to conceal his personal opposition to new vessels coming into East Coast waters. We accept the accuracy of the NMFS and ITC data.

Harold Torgersen acknowledged that some of those fishing on the East Coast may not have been able to find herring and mackerel readily. He attributed these difficulties to problems other than the lack of fish, however. He explained that herring are usually widely distributed and can be difficult to find. Advanced methods of targeting and capturing the fish would eliminate most difficulties. Mr. Torgersen also explained that mackerel swim much faster than the cod or haddock normally caught along the East Coast. The *Atlantic Star* was to be outfitted with the best sonar and finding equipment available.[4] Such a vessel, with substantially more horsepower than those vessels already operating off the East Coast, would be necessary to catch enough Atlantic herring and mackerel to compete with the European industry.

Mr. Torgersen also explained that in order to be profitable in the herring and mackerel industry, a vessel would need to be capable of staying out at sea for long periods of time. This would enable the vessel to stay with the fish as they moved, eliminating the need to continually relocate the schools of fish. He noted, however, that it was common practice for the smaller East Coast vessels to return to shore as soon as their relatively small storage tanks became full. This disruption made the fish more difficult to relocate. The court finds the explanations given by plaintiff's witnesses to be more plausible than Capt. Genovese's unsupported assertions. We conclude that there were ample stocks of

---

4. The *Atlantic Star* was equipped with sonar that could find herring within 4,000 meters and mackerel within 2,000 meters.

mackerel and herring in the western Atlantic. As explained more fully below, the *Atlantic Star* was uniquely well suited to find and catch them.

#### b. Financing and Marketing

After examining the ITC studies, Mrs. Torgersen investigated whether there would be a market into which she could sell East Coast mackerel and herring. While employed at BFI, she had established a thriving niche market for atka mackerel in Japan. Capitalizing on her strong ties to the Japanese buyers, Mrs. Torgersen sent samples of mackerel to three Japanese companies with whom she had done business previously. Each sent back an enthusiastic letter expressing their desire to purchase large quantities of Atlantic herring and mackerel. Mrs. Torgersen was also confident, based on her previous experience selling pollack with roe that she could cultivate a market for herring with roe among Japanese buyers. The court is persuaded that Mrs. Torgersen could have developed a market for herring, herring with roe and mackerel from the western Atlantic in Japan, as well as other markets.

Mrs. Torgersen then sought financing for a vessel to fish in the western Atlantic. Bryggens, an investment brokerage company, aided Mrs. Torgersen in her search. Initially, a plan was drawn up for the *Atlantic Star* to be a mother ship.[5] However, plaintiff was unable to obtain financing for the vessel on that basis. Investors did not think that the project would offer sufficient economies of scale to make the venture profitable. APFC changed its plans and began to seek financing for a vessel which would both catch and freeze its own fish in the western Atlantic.[6] APFC attempted to find financing for the vessel as a freezer trawler without updating the "mother ship" business plan provided by Bryggens.

Mrs. Torgersen was president and sole shareholder of Atlantic Star Fishing Company ("ASFC"). ASFC was formed in November of 1996 for ease of financing the purchase of a vessel designed solely for the Atlantic fishery. Mrs. Torgersen was also the president, secretary and majority shareholder of Pelagic Management Inc. ("PMI"), which was formed to manage the vessel ASFC purchased. Initially, ASFC and PMI joined as partners in APFC, with PMI as the general partner and ASFC as a limited partner. ASFC and PMI were then joined in APFC by Dutch partners, American Pelagic Combination, V.O.F., as APFC sought additional financing for its venture. American Pelagic Combination, V.O.F., owned by Parlevliet and Van der Plas, gained a 49% interest in APFC.[7] APFC eventually obtained financing from ING Bank in The Netherlands to purchase an existing vessel and convert it into a high volume mackerel and herring trawler.[8] APFC was the corporate entity which purchased the *Atlantic Star*.

#### 2. Facilities of the Atlantic Star

Upon securing financing for the venture, plaintiff sought a United States hull for purchase. Procuring an existing United States hull was necessary in order to receive the appropriate U.S. flag, as well as any U.S. fishing licenses. Plaintiff purchased a vessel,

---

5. A mother ship is a processing ship which does not catch its own fish. Instead, smaller vessels actually catch fish, which are then pumped onto the processing vessel. Once the mother ship processes the fish they are shipped to the final destination.

6. This type of vessel is known as a freezer trawler. A freezer trawler has the capacity to catch all its own fish. The fish are then frozen, or processed, on board the vessel. After the fish are processed, they are offloaded to be shipped to their final destination.

7. American Pelagic Combination, V.O.F. would later withdraw from APFC when the *Atlantic Star* was sold to Parlevliet and Van der Plas.

8. As a condition to gain financing, plaintiff obtained a $23 million political risk insurance policy from Lloyd's of London. The premium for the insurance policy was $290,000. Mrs. Torgersen testified that plaintiff did not receive any proceeds from this policy. The policy provided coverage, in part, "in the event that 'any of the permissions are revoked, cancelled or not renewed ...' Directly as a result of: (i) a Change in Law (as defined herein) and/or (ii) any change to the Open Access Policy relating to the Herring and/or Mackerel Fisheries in the North East Region ...." Instead, lenders with mortgages on the *Atlantic Star* received a payment from Lloyd's of London in a settlement.

which was then named *Apollo II*, for $1.7 million. At the time of purchase, the *Apollo II* was outfitted as an incinerator ship. APFC determined that the vessel was large enough to convert to a freezer trawler. Plaintiff concluded that the cheapest and fastest way to outfit the vessel for pelagic fishing in the western Atlantic was to have it towed to Norway and overhauled.

a. Outfitting the *Atlantic Star*

Mrs. Torgersen ensured that there was enough capacity to achieve profitable economies of scale when choosing fishing and freezing equipment. Additionally, APFC took great care to outfit the *Atlantic Star* with the best, most appropriate equipment for the East Coast herring and mackerel fisheries. The vessel was designed and outfitted as a high volume herring and mackerel trawler.

Capt. Robert Hempstead testified for plaintiff. Capt. Hempstead was the former captain of the *Atlantic Star* during the time that it fished in Mauritanian waters. Capt. Hempstead has been employed in the maritime industry since 1973, serving as captain, first mate and first officer on a variety of vessels. Capt. Hempstead showed comprehensive knowledge of vessels of the same size and capacity as the *Atlantic Star*, as well as the fishing industry in general. In particular he had a detailed understanding of the outfitting of the *Atlantic Star*. The court found Capt. Hempstead to be a highly reliable witness. He explained that the vessel was "purpose-built" for the East Coast fishery.

The Atlantic Star was outfitted with a single, large net, approximately 369 feet in length. It was attached to the boat by lines about 1000 meters long. The net was held open by two large steel doors attached to the back of the *Atlantic Star*, known as trawl doors. It could safely hold 400 to 500 metric tons of fish in what is known as the "codend." Capt. Hempstead testified that the boat could, in one five hour tow, catch at least 300 tons of fish. If it had been allowed to fish in United States waters, APFC would have out-

fitted the *Atlantic Star's* net with a sorting grid. The grid would have allowed smaller fish to escape, enabling the *Atlantic Star* to consistently catch a larger size of herring and mackerel.

The *Atlantic Star* had two engines with a total of more than 13,000 horsepower, far in excess of other pelagic trawlers on the East Coast. Almost 7,000 of this horsepower ran the generators for the freezing plant. The remaining horsepower was used to propel the ship. Plaintiff's witnesses testified that horsepower is extremely important when considering how much fish a particular vessel could catch, in part because the net of a vessel is designed around its horsepower. Capt. Hempstead explained that a vessel with more horsepower could tow a bigger net with bigger trawl doors at a higher rate of speed. High speed is important when catching mackerel, because the vessel must be able to keep up with the fish. A larger net and greater speed would, therefore, lead to more fish caught.

Mr. Arne Uhlen, plaintiff's expert on processing plants, testified that the *Atlantic Star* was outfitted with the best freezing equipment available, possibly better than any other ship at that time. He oversaw the operation of the *Atlantic Star's* processing plant during the time it fished in Mauritania. Mr. Uhlen has worked in the fish processing industry since the late 1970s, and displayed extensive knowledge about the industry. The court finds his testimony highly credible. He took pains to make his testimony accurate. Mr. Uhlen knowledge on the subject of processing was obviously based on extensive technical understanding, as well as personal experience.

Mr. Uhlen described the processing plan of the *Atlantic Star* as follows. Once caught, the fish were pumped on board, as opposed to hoisted onto the deck still in the net.[9] The *Atlantic Star* could pump 300 tons of fish into the hull in a matter of minutes. As the fish were pumped aboard they were sent through a dewatering tank. The fish were then pumped into the refrigerated seawater

9. Pumping on board was safer, as the stability of the vessel was not jeopardized by a large net of fish coming on board. Additionally, the fish

would remain alive longer while in the codend, instead of being crushed by other fish if brought on deck in the net.

tanks ("RSW tanks"). The vessel was outfitted with six RSW tanks. Each tank could hold up to 150 metric tons of fish. As with the fishing equipment, plaintiff incurred extra expense to purchase the maximum freezing capacity for the *Atlantic Star*. Once in the RSW tanks, chilled sea water was used to cool the fish. After they were cooled, the fish were pumped through a sorting machine.

The sorting machine, consisting of a system of rollers, would separate the fish into different sizes and send them into bins filled with chilled water.[10] After the fish were sorted according to size, they were pumped through a tube and into plate freezers. Once inside the freezers, the fish were frozen into solid blocks. The frozen blocks then traveled along a conveyor belt to machines which placed the blocks in cartons and strapped the cartons shut. Workers would then stack the cartons on wooden pallets.

The plan put forward by plaintiff is not a mere speculation. As explained *infra*, although the vessel was barred from United States waters, efforts were made to fish elsewhere. The *Atlantic Star* fished in Mauritania, the only fishery available without causing the loss of its status as an American-flagged vessel. Mrs. Torgersen put the mechanics of this plan for the ship fully into operation when it was in Mauritania.[11]

b. Plans to Offload at Sea

APFC intended to offload 90% of its frozen fish at sea. This approach was more profitable than going to shore to offload because the vessel would be able to stay at sea, eliminating transit and searching time. The ship was outfitted with everything necessary to remain at sea for months at a time. The *Atlantic Star* had two custom-made cranes. They were designed to lift eight tons and intended to aid the vessel in offloading in whatever weather conditions the vessel might face. The ship carried sufficient fuel, food and parts for an extended trip, and could have been re-equipped by other ships. Further, Capt. Hempstead testified that weather would not play a significant role in the ability of the *Atlantic Star* to fish or remain at sea.[12] The *Atlantic Star* demonstrated its capacity to off-load at sea during its tour in Mauritanian waters.

We give little credence to the contrary testimony of Michael Love. Mr. Love was a former employee of APFC. He was hired to aid in the effort to lobby Congress to allow the *Atlantic Star* to retain its fishing permits. He later served on the crew of the *Atlantic Star* in Mauritania. Mr. Love returned home to the East Coast after the first fishing trip and was not recalled to the *Atlantic Star*. Mr. Love's courtroom demeanor made his unfavorable views of plaintiff clear.[13] Furthermore, it was apparent to the court that Mr. Love had no knowledge of plaintiff's initial business plans, prior to meetings with Congress. Mr. Love testified that he was not present for the initial discussions regarding financing or choice of equipment. Thus, any knowledge about whether plaintiff intended to off load at sea came only after plaintiff was making concessions in an effort to appease members of Congress. The court finds his testimony unreliable. We therefore find that plaintiff intended to offload 90% of its cargo to tramper vessels at sea.[14]

---

10. Although the vessel ultimately never fished for herring, the court found the testimony of Ms. Torgersen, Mr. Torgersen and Mr. Uhlen highly credible that the sorting machines were sophisticated enough to sort herring with roe from herring without roe.

11. Plaintiff provided the court with a DVD containing a tour of the vessel as it operated in Mauritania.

12. In fact, Hempstead testified that in the Baltic Sea, a trip discussed *infra*, where the weather conditions are notoriously bad, the *Atlantic Star* was only kept from fishing approximately half a dozen days.

13. Defendant attempted to show that Mr. Love was a part owner in the *Atlantic Star*, in order to show that he was qualified to testify regarding the value of the business. However, Mr. Love held, at most, a de minimus interest, for which he never paid. The court, therefore, does not rely on Mr. Love's testimony with respect to APFC's value.

14. A tramper vessel is a commercial fishing vessel which transports cargo whenever it is hired to do so.

### 3. Atlantic Star Precluded from Fishing in United States Waters

While the *Atlantic Star* was being overhauled in Norway, at a cost of approximately $34 million, plaintiff applied for and obtained all necessary fishing permits.[15] The permits were reissued to the vessel on April 8, 1997 and April 12, 1997. In November 1997, as the *Atlantic Star* was poised to begin fishing, its permits were retroactively voided. At the same time, APFC was prospectively barred from obtaining new permits.[16] The details of the permitting process and subsequent loss of the permits are discussed in greater depth in *American Pelagic I*, 49 Fed.Cl. at 40.

### 4. Trips Made by the Atlantic Star

#### a. Baltic Sea trip

Mrs. Torgersen testified that she tried to put the vessel to some use during what she hoped would be a temporary moratorium after passage of the 1997 Appropriations Act. She took the *Atlantic Star* to the Baltic Sea to participate in a research project. The *Atlantic Star* did none of its own fishing, but operated as a mother ship, processing fish from catching vessels. The vessel only remained in the Baltic Sea for a few months, because the venture was not profitable.

#### b. Mauritania trip.

Plaintiff was able to utilize the *Atlantic Star* as a fishing and processing vessel for the first time off the coast of Mauritania, in west Africa. Mauritania does not have a fishing fleet of its own and it imposes no restrictions on foreign flagged vessels. Instead, vessels must simply purchase fishing permits. The *Atlantic Star* thus was able to purchase fishing rights while maintaining its status as a United States flagged vessel.

The equipment aboard the *Atlantic Star* performed exactly as expected in Mauritania.[17] The best day of processing for the *Atlantic Star* was 14,872 blocks or approximately 342 metric tons in one day.[18] Within one month, the ship was performing better than any other ship in Mauritania. However, the lack of consistent quantities of fish precluded the vessel from processing at its full capacity. Thus, the *Atlantic Star* was unable to produce to its highest level of 340 metric tons per day, nor at the rate of 250 metric

---

**15.** In order to fish for, possess, or land Atlantic mackerel in the Exclusive Economic Zone of the United States, plaintiff was required to apply for a permit under 50 C.F.R. § 648.4(a)(5). Because incidental by-catch of nonregulated species was possible, plaintiff applied for a Northeast Multispecies (Nonregulated) permit under 50 C.F.R. § 648.4(e)(1). Plaintiff requested an authorization letter from the Regional Administrator in the Gulf of Maine/Georges Bank Regulated Area for plaintiff's net, because the mesh size necessary for herring and mackerel was smaller than normally required by 50 C.F.R. § 648.80(d). The Northeast Regional Office of NMFS issued the following permits on February 5, 1997:

   1. Federal Fisheries Permit # 610018, for Atlantic mackerel and *Illex* squid and for incidental *Loligo* squid and butterfish, with an expiration date of December 31, 1997.
   2. Federal Fisheries Permit # 610018, for Northeast Multispecies (Nonregulated), with an expiration date of April 30, 1998.

**16.** Congress adopted section 616 of the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1998, Pub.L. 105–119, 111 Stat 2440 (1997) ("1997 Appropriations Act"), which had the initial effect of revoking plaintiff's permits and barring their reissuance for one year. An identical provision was enacted on October 21, 1998 as

section 617 of the Department of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 1999, Pub.L. 105–277, 112 Stat. 2681 (1998) ("1998 Appropriations Act"). Plaintiff was permanently barred from obtaining herring and mackerel permits by § 3025 of the 1999 Emergency Supplemental Appropriations Act, Pub.L. 106–31, 113 Stat. 57 ("1999 Appropriations Act").

**17.** Arnie Uhlen did discuss some minor problems with a strapping machine, which was used to close the cartons containing frozen blocks of fish. He acknowledged that for a time only two machines worked. However, the machines were promptly fixed.

**18.** The figure 342 metric tons represents 14,872 blocks, multiplied by 23 kilograms. Plaintiff explained that while in Mauritania it packaged up to 23 or 24 kilograms of fish into each carton. These cartons would normally hold 20 kilograms. Plaintiff explained that the fish from Mauritania are often bound to west African markets where weight scales are not available. Therefore, the cartons are packed full so that the buyer knows that it has not been cheated. Plaintiff explained that full packing was possible because there was no reporting regime in Mauritania, which would have required accounting for the extra kilograms of fish.

tons plaintiff proposes here, on a regular basis.

Not only was the *Atlantic Star* plagued by a lack of fish, Mauritanian waters posed unique problems for processing. The temperature both of the sea water and the fish in Mauritania was significantly warmer than it would have been in the western Atlantic. It took longer to chill the fish in the RSW tanks, and longer to freeze them in plate freezers. Mr. Uhlen testified that, in contrast, the water temperature on the East Coast of the United States would have been perfect for the processing system of the *Atlantic Star*, especially in wintertime. Although the conditions were not ideal in Mauritania, Capt. Hempstead testified that the experience in Mauritania showed that the *Atlantic Star* could have operated extremely well in the western Atlantic.

Plaintiff lost money during its time in Mauritania despite the fact that it outfished every other vessel. Mauritanian waters simply did not offer enough fish for a long enough period of time to allow the *Atlantic Star* to be profitable. Other boats were able to supplement their catch by fishing during prime season in Mauritania, but then spending the rest of the year in European waters. The *Atlantic Star* was prohibited from doing the same because it could not fish in European waters. By April 1999, APFC was operating at a loss, and behind on payments. Suppliers were considering arresting the vessel due to the nonpayment of invoices. Attempts to secure additional financing by APFC were unsuccessful. After considering and rejecting Chapter 11 bankruptcy, the partners of APFC, Parlevliet and Van der Plas, agreed to take over both the payment of bills and the revenue of the *Atlantic Star*. Parlevliet and Van der Plas eventually purchased the *Atlantic Star* from APFC on July 6, 1999.[19] From April until July, APFC continued to pay corporate expenses, but Parlevliet and Van der Plas assumed the revenues and expenses for the vessel.

### 5. Other Profitable Options not Open to Plaintiff

#### a. Alternative Fishing Options

Defendant intimates that plaintiff could have fished for herring alone, since permits were not required for herring in the western Atlantic. Mrs. Torgersen testified that mackerel is an inevitable by-catch when fishing for herring.[20] Defendant concedes that a permit is required just to possess mackerel. The 1997 Appropriations Act and 1998 Appropriations Act precluded the *Atlantic Star* from holding the necessary permit. Therefore, we conclude that the *Atlantic Star* could not fish for herring alone, because of the inevitable by-catch of mackerel.

In addition, plaintiff could not take the vessel to any other United States fisheries. The other fisheries within the United States Exclusive Economic Zone ("EEZ") have their own permitting regime, none of which would have been open to the *Atlantic Star*. Under the 1997 Appropriations Act and the 1998 Appropriations Act, no permits of any kind could be issued to plaintiff.[21] The 1999 Appropriations Act only restricted the availability of APFC to obtain herring[22] and mackerel permits. Even so, Mrs. Torgersen

---

19. Plaintiff recorded a gain on the sale of the vessel. Ms. Wendy Visconty, plaintiff's accounting expert, explained that this gain resulted from the difference between removing the vessel from the books and the liabilities associated with the vessel from the books. The gain was not, according to Ms. Visconty, a cash gain to plaintiff.

20. Capt. Genovese also testified for defendant that herring and mackerel swim together, and are inevitably by-catch of one another.

21. The 1997 Appropriations Act § 616(a)(2) stated that none of the funds appropriated in the bill may be made available to issue or renew a fishing permit or authorization "that would allow such a vessel to engage in the catching, taking, or harvesting of fish in any other fishery within the exclusive economic zone of the United States." A vessel could have a permit if it had documentation or endorsements prior to September 1997 and were not surrendered at any time afterwards. However, § 616(c) declared all of APFC's permits to be null and void. Therefore, after the passage of the 1997 Appropriations Act, plaintiff was barred from fishing anywhere a permit was required within the United States EEZ. The language of the 1998 Appropriations Act was identical.

22. Although not specifically required for the western Atlantic fishery.

testified that there was no other fishery large enough in the United States EEZ in which plaintiff could obtain a permit which could have allowed the *Atlantic Star* to make a profit. For instance, the Alaskan fishery was already regulated under a limited access plan. This meant that the fishery was already fully capitalized and open only to those vessels with a prior catch history.[23]

Mrs. Torgersen testified that the only fishery outside of the United States in which the *Atlantic Star* could obtain fishing rights was Mauritania. In order to fish in the EEZ of any other country, re-flagging the vessel would have been necessary. As discussed above, the *Atlantic Star* lost money fishing in Mauritania.

b. Mother Ship Option

Another suggested use of the *Atlantic Star* was as a mother ship. There were several factors which precluded utilizing the vessel in this manner, however. First, APFC could not obtain financing for a venture in which the *Atlantic Star* was simply a mother ship. Because of the *Atlantic Star's* design and equipment, it probably would have lost money as a mother ship.[24] Second, the vessel could not possess any mackerel without a permit, even as a mother ship.

In sum, Mrs. Torgersen conducted an exhaustive, although ultimately unsuccessful, search for a fishery in which the *Atlantic Star* could be operated profitably and in which it was eligible to obtain all the necessary permits. Defendant offered no evidence to the contrary.

6. *Plaintiff's Theory of Recovery*

APFC's compensation model is based on the fair rental value of the *Atlantic Star*. Unfortunately, there was no existing market for leasing a vessel like the *Atlantic Star*

fishing off the East Coast. The *Atlantic Star* was unique. Contrary to defendant's suggestion, however, this does not preclude a request for compensation. We agree with Dr. James Miller, plaintiff's expert, that an appropriate model for fixing fair rental value can be derived from the reasonably established net revenue stream.

Dr. Miller is the chairman of an international economic, financial and regulatory consulting firm. He is the former Director of the Office of Management and Budget, former Chairman of the Federal Trade Commission, and has served in several other government capacities. Dr. Miller received a Ph.D. in economics from the University of Virginia. He has taught economics at University of Virginia, George Washington University and George Mason University. His testimony was clear, thorough and showed an understanding of the realities facing the *Atlantic Star*. The court found him to be a highly competent, reliable witness.

Dr. Miller utilized the net revenue stream which would have been available to the *Atlantic Star* in order to determine what the rental value of the vessel would have been in a fair market. He explained that, as with any lease, the total income stream available to the lessee and lessor is a fixed amount. Therefore, whether the lessee were to take on all costs and revenues and pay a fixed amount to lessor, or lessor were to assume some costs for a portion of the revenues, the net effect would be the same. In a competitive market, the difference between the amount that the lessor could have made operating the vessel itself or renting to the lessee will be razor thin. The net revenue stream is an appropriate measure, therefore, for rental value. It represents what the lessee would be willing to pay and what the lessor willing to accept as reasonable rental

---

23. A prior catch history, according to Mrs. Torgersen's testimony, is the catch which a particular vessel was able to land in previous years.

24. Capt. Hempstead explained that the *Atlantic Star* had been outfitted to fish and process. This investment was useless when the *Atlantic Star* was used as a mother ship. Plaintiff could not have operated profitably unless it utilized the whole of its capacity. Mr. Uhlen's testimony to the contrary is not persuasive. He acknowl-

edged that he was not sure that such an option was actually profitable. His expertise related to the processing capabilities of the vessel, not its financial management. Mr. Love offered an opinion about the ability of the *Atlantic Star* to operate as a mother ship based on the assumption that the *Apollo II* hull had been outfitted from the outset as a mother ship-a completely separate question.

value. Furthermore, Dr. Miller testified that the conservative nature of the projections he used for plaintiff's revenues, combined with a generous allowance for costs, would leave ample room for a potential lessee to make a significant profit. The business opportunity would have been very attractive to a potential lessee.

After determining the appropriate monthly rental fee, based on the *Atlantic Star's* revenue stream, Dr. Miller adjusted the monthly fees back to the beginning of the damages period. In order to bring each month's rent back to the first month of the taking, Dr. Miller applied the weighted average cost of capital ("WACC"). He explained that each corporation's WACC is based on its cost of debt and equity and the corporation's mix of each. The cost of debt is determined by the cost of third-party loans held by that entity. The cost of equity is determined by the return on equity earned by other fishing firms during the same period. Taken in their relative proportion in APFC's financing structure establishes APFC's WACC of 18.5%. When he brought the operating margin back to December 1997, the first month of the taking, the rental value for the *Atlantic Star* was $44,742,926. Dr. Miller based his calculations on a 75,000 metric ton per year model. The net revenue from the sale of herring and mackerel would have been $72,577,500. The total costs, based on a 75,000 metric ton model were estimated at $27,834,574.

Once plaintiff's revenue stream for the rental of the *Atlantic Star* was brought back to the date of the taking, Dr. Miller applied a rate for a safe investment, the five year treasury rate, to bring plaintiff's damages to current dollars. The current value of the rental value of the *Atlantic Star* at the time of trial was $55,913,929. The reasonableness of plaintiff's damages model will be discussed *infra*. However, the court first addresses disputes with respect to the figures for revenues and costs imbedded within the calculation.

a. Price of Herring and Mackerel

Plaintiff's expert, Mr. David Ellenton, provided the court with an analysis for the appropriate sales price for herring and mackerel. He has a wealth of knowledge about the world export market for herring and mackerel based on experience marketing large volumes of fish. Mr. Ellenton was a very convincing witness.

Mr. Ellenton determined that American export prices were not the appropriate measure, because they were too high. The overall American market for Atlantic herring and mackerel is very small. The majority of Atlantic herring and mackerel caught in America goes into the domestic bait market, a small niche market which artificially inflates the average price of Atlantic herring and mackerel. American producers do not sell in volume into the larger international markets, and their prices thus do not provide a good benchmark for the volume of fish APFC would produce. Therefore, he examined the Dutch and Norwegian export prices for herring and mackerel.[25] Norway and Holland are the world's largest producers. According to Mr. Ellenton, due to the volume of fish the *Atlantic Star* would have marketed, Dutch and Norwegian prices are the appropriate starting point.

Mr. Ellenton established an average Dutch and Norwegian price for each month during the damages period based on information provided by the Norwegian Seafood Export Council and the Netherlands Central Bureau of Statistics. The raw data provided by these agencies listed the price for herring or mackerel sold into a particular country by month. Mr. Ellenton established an average monthly price based on the prices for those markets into which he anticipated APFC would sell. He made no decisions about how much of plaintiff's anticipated 75,000 metric tons of fish would be sold into each particular country. Instead, he included in his average price all of those markets into which he anticipated APFC would sell. He then ad-

25. During trial defendant objected to Mr. Ellenton's testimony as it related to world export prices. During discovery the parties had agreed to rely upon United States export prices for Atlantic herring and mackerel. However, the government's own witness based his opinion on the same world export prices. This made irrelevant the attorneys' prior agreement.

justed that price based on the average exchange rate from Dutch and Norwegian currency.

Mr. Ellenton explained that the *Atlantic Star* may not have been able to sell fish at the Dutch and Norwegian prices. As a new vessel in the market, the *Atlantic Star* would have a market entrance barrier to overcome. Additionally, the fat content in the fish supplied in the United States might be lower than that supplied by Dutch and Norwegian vessels. This could have affected price, because some purchasers prefer fish with higher fat content. These differences led Mr. Ellenton to make a reduction of 10% to both the Dutch and Norwegian export prices. He then averaged the two, concluding that APFC would have received $ 0.41 per kilogram for Atlantic herring and $ 0.73 per kilogram for Atlantic mackerel. The prices which Mr. Ellenton provided were free on board ("F.O.B.") [26]

The government's expert on this issue, Mr. Jeffery Reichle, did not dispute the basic premise of Mr. Ellenton's analysis-that American export prices were not an accurate model for prices the *Atlantic Star* would have received. Beyond that point, however, he and Mr. Ellenton parted ways.

Mr. Reichle did not pretend to be a disinterested witness. He was heavily involved in the lobbying effort to keep the *Atlantic Star* from fishing off the East Coast. Furthermore, Parlevliet and Van der Plas, the partners of ASFC in APFC, had offered to buy Mr. Reichle's business, Lund's Fisheries. In his view, the offered purchase was an effort to remove him as an opponent to the *Atlantic Star*. Furthermore, his testimony reflected inattention to detail and a lack of knowledge about Mr. Ellenton's method. Nor was he experienced in the volumes of fish APFC would have sold. For these reasons, the court gives little weight to his testimony.

Mr. Reichle opined that only Dutch prices for herring and mackerel were appropriate measures. He thus excluded Norwegian export prices. Mr. Reichle reasoned that almost all Norwegian product went to Japan because Norwegian fish were caught by purse seine nets and frozen by blast freezers, making them more desirable. However, Mr. Reichle testified that he did not know whether Mr. Ellenton had made any adjustments based on where APFC would market its fish and he was unaware which markets Mr. Ellenton included in his average Norwegian price. Additionally, Mr. Ellenton's report provides sufficient evidence that the Norwegian product was not, in fact, sold primarily to the Japanese market. The court rejects Mr. Reichle's reliance on Dutch prices alone.

Mr. Reichle made certain price reductions to Mr. Ellenton's model. Mr. Reichle opined that the fat content of Atlantic herring and mackerel in the western Atlantic tends to be lower than that in Dutch waters. Additionally, he testified that those fish caught in the western Atlantic tended to be smaller than those in the Dutch waters. He reasoned that a 10% quality adjustment from the Dutch price for mackerel and 15% for herring was appropriate. Mr. Reichle stated that a differentiation between APFC prices and the Dutch prices was necessary because the Dutch fleet was made up of primarily purse seines. According to him, purse seines would produce a higher quality of fish because they would not damage the fish in the same way that a trawl vessel would. Finally, Mr. Reichle explained that the vertical plate freezers which APFC intended to use would produce a lower quality of frozen fish than usually provided by Dutch vessels, which used blast freezers.

Mr. Reichle provided no information as to why a greater adjustment was necessary for herring as opposed to mackerel. Further, he did not explain why the quality adjustments Mr. Ellenton made were not sufficient. Mr. Ellenton testified that his 10% price reduction took into account the difference in fat content between the American and European producers. Mr. Torgersen testified that during the damages period the Dutch fleet did not, in fact, contain *any* purse seines. In addition, both Mr. Torgersen and Mr. Ellenton explained that the majority of Atlantic

---

**26.** A F.O.B. price assumes that the fish are sold direct from the vessel. The price does not incorporate a cost for shipping.

herring and mackerel are frozen in the same manner as the *Atlantic Star.* In fact, Mr. Ellenton testified that there was almost no gap in the quality between American and European product. It would be even less significant for the *Atlantic Star,* which would be able to catch larger fish and process them without damage. The court rejects Mr. Reichle's quality adjustments.

Mr. Reichle also made a reduction in price for the increased distance between the vessel and its final market for APFC, in comparison to Dutch producers. Mr. Reichle reasoned that a $0.035 per kilogram reduction from plaintiff's prices would be appropriate for the difference in freight costs. He opined that because the *Atlantic Star* would be off the East Coast of the United States it would have to pay more for transport to final markets.

There are several problems with Mr. Reichle's adjustment. First, he relied on Mr. Ellenton's prices for his analysis, which were F.O.B. Therefore, as pointed out in the supplemental report of plaintiff's accounting witness, Ms. Visconty, freight is most appropriately an additional cost, not an adjustment to price. Nor did Mr. Reichle provide a basis for the amount of his adjustment. He exhibited a lack of knowledge regarding shipping cost for the volume of fish which APFC proposed. This lack of knowledge was compounded by the fact that he calculated an adjustment for freight not knowing into which countries Mr. Ellenton's price reflected sales. For these reasons, the court makes no adjustment to plaintiff's price for transportation costs.

Finally, the court rejects Mr. Reichle's adjustment based on his understanding that Dutch producers routinely package 23 kilograms into 20 kilogram cartons. As explained by Mr. Torgersen, the Dutch regulatory system requires that every kilogram of fish which is caught, as well as every kilogram of fish produced, be reported. The Dutch prices reflected in Mr. Ellenton's reports are reported by the kilogram, and not by the carton. Therefore, whether a carton could hold 20 or 23 kilograms would be immaterial for purposes of determining price, since the prices are reported per kilogram.

Furthermore, plaintiff's witnesses, whom the court finds to be more reliable, all testified that the there is no over-packing done by Dutch producers. Instead, if a market, as in Mauritania, requires that a carton is packed full, both the buyer and seller understand that the price negotiated is per kilo, no matter how full any particular carton may be. Therefore, the court will not adjust plaintiff's prices for a difference in Dutch packaging methods.

b. Price of Herring with Roe

Mr. Ellenton determined that the most appropriate price for herring with roe was $1.38 per kilogram. Unlike prices for Atlantic herring and mackerel, Mr. Ellenton determined that the United States export price was, in fact, the most accurate measure. He reasoned that the price of herring with roe sold to Japan and China today from the United States is the most analogous to the product that APFC would have sold. Currently, the United States exports herring with roe caught off the West Coast. Mr. Ellenton confirmed Mrs. Torgersen's view that the *Atlantic Star* would have caught enough herring with roe to create a market at $1.38 per kilogram. He acknowledged that there are routine closures, disallowing fishing during specific time periods along the Gulf of Maine during the herring spawning season. However, Mr. Ellenton explained that there are no closures on George's Bank, in northern Maine. He testified that the *Atlantic Star* could have harvested enough herring with roe there to provide a sufficient supply to maintain the $1.38 per kilogram price.

In contrast, Mr. Reichle concluded in his expert report that APFC had not intended to market herring with roe. In addition, Mr. Reichle testified that he had no experience marketing that product. Nor was he aware of Mrs. Torgersen's ties to the Japanese market. He based this on the deposition of Mrs. Torgersen, in which, when asked if there were any mention of Atlantic herring with roe in the 1998 budget, she responded that there was not. She went on, however, to explain that the 1998 budget was a "preliminary, probably working document and it

was just to get an idea of the overall, just the big picture." Furthermore, this preliminary budget was prepared during negotiations with Congress. Mr. Reichle conceded that the budget to which Mrs. Torgersen referred in her deposition had little bearing on her plans to market herring with roe. It was also apparent from Mrs. Torgersen's testimony, as well as her business plans that APFC did, in fact, intend to market herring with roe. The court finds that there is no basis to reject Mr. Ellenton's price for herring with roe.

#### c. Costs

The second element of plaintiff's damage calculation is the offsetting cost of operation. Ms. Wendy Visconty, a managing director of RSM McGladrey, Inc., testified for the plaintiff. She was qualified as an expert in auditing as well as accounting, particularly for businesses of the size and type of APFC. She had experience with auditing Alaskan fishing vessels. Ms. Visconty provided the court with an extensive and detailed analysis of the *Atlantic Star's* costs. Her report was well documented and thoroughly researched. Unlike defendant's accounting expert, Mr. Paul Berdy, Ms. Visconty did not have any personal connection to the case.

She included three categories of costs: materials, labor, and manufacturing overhead. Within materials she included costs necessary to package the *Atlantic Star's* catch, as well as those expenses related to offloading and storage. The cost of packaging material, including the cartons and their plastic liners, was independently verified by a quote obtained from a supplier at $3,752,000. Ms. Visconty included docking, cold storage, and pallet replacement within her calculations for off-loading at $636,000. These costs were approximated from available prices from actual suppliers.

Labor costs of $12,584,135 included crew salaries and share, payroll taxes, technician fees, crew travel, and galley supplies. For crew salary and share,[27] technician fees, as well as the computation payroll taxes, Ms. Visconty assumed that for highly skilled workers, the *Atlantic Star* would be competing with similarly outfitted vessels in the Alaskan fisheries. She explained that in this industry it is common for highly skilled crew to be flown long distances in order to outfit vessels. Ms. Visconty therefore based her opinion on salaries, technician fees, and crew share information for the *Atlantic Star's* crew in Mauritania, but also for similar vessels in Alaska. This resulted in higher overall costs. She then included a modest increase to these costs in order to make the estimates very conservative, i.e., higher. She based her estimates for crew travel and galley supplies on the *Atlantic Star's* actual experience in Mauritania, once again including an adjustment to ensure the estimates were conservative.

Finally, Ms. Visconty estimated costs for manufacturing overhead. She included $10,862,439 in costs for spare parts, repairs and maintenance, fuel, insurance, brokerage fees, administration[28] and other miscellaneous expenses. Once again, Ms. Visconty relied on both independent research and the *Atlantic Star's* experience in Mauritania. As with the earlier expenses, she included an adjustment in order to ensure her numbers were not only accurate, but conservative. Therefore, although the *Atlantic Star* only incurred, on average, $52,000 per month in spare parts costs, Ms. Visconty's report includes costs of $100,000 per month in costs. The increase allowed for the replacement of a net, as well as the wear which could occur because of aggressive fishing on the East Coast. The same type of analysis was done for repairs and maintenance. Fuel costs were estimated based on the fuel usage of similar sized engines. Insurance, brokerage and other miscellaneous fees were calculated by comparison to vessels of similar size.

Mr. Berdy testified for defendant. He did not dispute Ms. Visconty's basic analysis. He contended that there were costs missing

---

27. Ms. Visconty testified that the cost for crew share would vary according to the amount of the *Atlantic Star's* production, because crew share is calculated on a percentage of production sold.

28. Brokerage fees and administration costs, according to Ms. Visconty would have a direct relationship with production by the *Atlantic Star.*

from her report. He explained in his report that an *ad valorem* customs fee, political risk insurance, and drydocking costs should all be included within *Atlantic Star's* expenses. Mr. Berdy also opined that the costs provided by Ms. Visconty should be altered based on what he termed inconsistencies in the record. He asserted that previous testimony by Mr. Love and Mrs. Torgersen conflict with Ms. Visconty's cost assumptions. Furthermore, Mr. Berdy testified that the crew compensation level proposed by Ms. Visconty was too low.

Without calling into question Mr. Berdy's general competence as an accountant, we have serious misgivings about his qualifications to testify in this case. Mr. Berdy had very limited experience in providing accounting services for fishing operations. Nor was he a disinterested witness. His limited experience was largely based on his work for Lund's Fisheries, which is owned by Mr. Reichle. Mr. Berdy traveled to the Netherlands with Mr. Reichle for meetings with Parlevliet and Van der Plas to discuss the purchase Lund's Fisheries. Mr. Berdy worked with an accountant from the Dutch partners and came up with a projected sales price for Lund's Fisheries. Mr. Berdy acknowledged that he did not directly rely on Generally Accepted Accounting Principles in his analysis. He exhibited a general lack of knowledge about the facts of this case.

Mr. Berdy testified that plaintiff should have included in its calculations an *ad valorem* customs duty which may have been assessed on the *Atlantic Star*, as well as the premiums for political risk insurance and additional drydocking costs. With respect to the *ad valorem* duty, Mr. Berdy relied on Mrs. Torgersen's deposition in which she referenced a $2 million estimate for this customs duty. When pressed by plaintiff's counsel Mr. Berdy conceded that he had made no further inquiries into the nature of the assessment, and "without doing proper research, [he] wouldn't know" whether the *ad valorem* duty should be included as an operating cost.

Ms. Visconty explained that because the *ad valorem* tax is assessed on the vessel itself, as opposed to its operation, the tax is a capital cost. It is generally considered to be part of the cost of constructing a vessel. In addition, the nature of an *ad valorem* tax is that it is subject to negotiation between vessel owners and the government over a period of one to two years. She therefore concluded that the *ad valorem* tax should not be considered an operating cost.

Mr. Berdy also displayed a lack of understanding with respect to how the *Atlantic Star* had been financed. He was unaware of the reasons for obtaining political risk insurance and the terms of that insurance. Mr. Berdy stated that he would have to do further research before he could be sure that the cost of political risk insurance should be included within expenses. Because Mr. Berdy himself is not sure whether these costs should be included, the court will rely on Ms. Visconty's more authoritative analysis leaving them out.

Mr. Berdy's inclusion of drydocking costs was based on Mrs. Torgersen's offer to Congress to spend $1,000,000 on a repair facility in New England. There is no question that this was not a necessary cost. The offer was made in response to political pressure in an unsuccessful effort to preserve her fishing rights. For the same reasons, we decline to make any adjustments to Ms. Visconty's analysis as it relates to offloading costs. Mr. Berdy also based this adjustment on statements made by Mrs. Torgersen to members of Congress with respect to her willingness to build a cold storage facility and offload the majority of its catch on shore. We decline to make Mr. Berdy's proposed adjustments.

Finally, the court will not adopt Mr. Berdy's analysis of crew costs, which was based on Mr. Love's testimony. Without meeting Mr. Love, understanding his relationship to plaintiff, or independently verifying his testimony, Mr. Berdy opined that the court should rely on Mr. Love's testimony regarding crew compensation. As explained earlier, the court did not find Mr. Love's testimony credible in its own right. It is no more credible when filtered through Mr. Berdy's report. Furthermore, Ms. Visconty provided the court with an extensive analysis of the *Atlantic Star's* actual compensation of its crew, as well as salaries for similar vessels in

Alaskan waters. The court finds this to be more reliable. We therefore make no adjustment to plaintiff's crew compensation costs.

#### d. Adjustment to Catch Volume

One adjustment to the basic assumptions of plaintiff's model must be made, however. In his calculations, Dr. Miller assumed that the *Atlantic Star* would produce 75,000 metric tons of fish (37,500 metric tons of herring, 37,500 metric tons of mackerel) each year. Plaintiff put forward testimony and exhibits showing the availability of fish well in excess of this 75,000 metric tons per year. Plaintiff met its burden to show that the *Atlantic Star* was physically capable of catching and processing this amount of fish each year. Defendant nevertheless urges the court to adjust plaintiff's model to reflect 50,000 metric tons per year, based on two theories.

First, defendant looks to plaintiff's comments made to Congress. Plaintiff had some notice that Congress, in response to pressure from owners of small local vessels, was considering voiding its permits. The government makes much of plaintiff's efforts to forestall congressional action. Mrs. Torgersen, along with Michael Love, met with members of Congress, including Senator Olympia Snow. At those meetings, plaintiff attempted to come to some agreement with those members whose constituents had expressed concern about the *Atlantic Star*. Mrs. Torgersen put together several proposals. One of these proposals would place a self-imposed limit of 50,000 metric tons per year on the vessel. The efforts were to no avail. Nevertheless, defendant offers plaintiff's statements as proof that its original plans were actually smaller than 75,000 metric tons, on a scale with the reduced plans for harvesting offered under the duress of the negotiating process with Congress.

We are surprised and disappointed that the government would make use of statements, prompted under what amounts to political duress, to draw into question Mrs. Torgersen's credibility. The discussions between Mrs. Torgersen and members of Congress were about political compromise, not plaintiff's initial expectations. Plaintiff was at risk of losing its entire investment in the *Atlantic Star*, and, not surprisingly, was willing to make large concessions in order to preserve some value in that investment. We therefore assign no meaning to statements made during the negotiations about fishing capacity, on shore facilities or off-loading on shore.

The court is thus persuaded that the *Atlantic Star* was capable of producing in excess of 50,000 metric tons of fish. Indeed we are persuaded it was capable of producing in excess of 75,000 metric tons. The capacity and fish were there. In terms of the rental value of the boat, however, it is also relevant to know what would have been represented to prospective, albeit, tentative, renters. In this respect, plaintiff's business plan is important, and it is the evidence as to that plan which introduces uncertainty about the 75,000 metric ton figure, for an annual catch.

Uncertainty as to this figure was introduced by Mr. and Mrs. Torgersen themselves in their affidavits in support of plaintiff's motion for summary judgment. Mrs. Torgersen provided a declaration in support of Plaintiff's Response to Defendant's Motion for Summary Judgment in July of 1999. In it, Mrs. Torgersen stated that APFC had planned to harvest Atlantic mackerel from December to May and Atlantic herring year round "for a total approximate amount of 50,000 [metric tons] per year." Mr. Torgersen agreed with those statements. Neither Mr. Torgersen nor Mrs. Torgersen were under compulsion to provide the court with that number. Plaintiff is bound by such statements. There is no reason the court should not rely upon them. We therefore find that plaintiff's original plans called for producing approximately 50,000 metric tons of herring and mackerel per year. This figure represents an unquestionable quantity that it both planned to produce and could in fact produce, and thus an appropriate figure for calculate what a willing renter would have paid.

### DISCUSSION

#### A. Impact of *Tahoe* Regulatory Takings Analysis

■ After our decision in *American Pelagic I*, the Supreme Court decided *Tahoe–*

*Sierra Pres. Council v. Tahoe Reg. Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), addressing the elements of a temporary regulatory taking. The Court rejected a *per se* rule modeled solely on *Lucas,* because of its concern that the rule would make routine moratoria actionable. The routine delays inherent in a legitimate regulatory process should not prompt an automatic temporary taking. Instead, if regulatory action has the effect of denying all economically viable use of property, a *Penn Central* analysis is then conducted in order to determine whether, under "all the relevant circumstances" a taking is established. *Tahoe–Sierra,* 535 U.S. at 335, 122 S.Ct. 1465 (referring to *Palazzolo v. Rhode Island,* 533 U.S. 606, 636, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)).

■ In the present case, the "relevant circumstances" include the fact that the character of the government action here strongly tends toward a taking. Congress retroactively revoked plaintiff's permits in a targeted fashion. The *Atlantic Star* was the only vessel which fell within the ambit of the 1997, 1998, and 1999 Appropriation Acts. It is clear from the record that Congress' decision was not the result of a typical regulatory process. Instead, it was motivated by political considerations directly aimed at the *Atlantic Star.* Congress' action was far from being a routine delay in agency decision-making. There was no permit application pending. All permits had been granted. No decision was held in abeyance pending fact finding. Congress simply decided not to allow the *Atlantic Star* to fish using its previously issued permits. The character of the government action thus points to a taking. None of the Court's concerns in *Tahoe* about promoting deliberative regulatory consideration apply.

We thus confirm our previous holding that the three-part *Penn Central* test for a taking is met. The plaintiff had a reasonable investment backed expectation that it could profitably, legally, use its vessel. As further explained below, the economic impact was a 100 percent loss of economically viable use. And, finally, the character of the government's action points to a deliberate decision to take the use of the vessel for public purposes.

**B. "All Economically Viable Use"**

In *American Pelagic I,* we found that no other economically viable uses were available to the plaintiff. Nevertheless, because we left open the question of whether plaintiff had established any economic impact of the legislation, we allowed defendant at trial to offer evidence of alternative uses. As we found *supra,* however, there were indeed no other profitable uses available to the *Atlantic Star.* Defendant nevertheless offers three other arguments as to why plaintiff's evidence still does not satisfy its burden of proof.

Where a taking has occurred, compensation is required for a taking in "the extraordinary circumstance when no productive or economically beneficial use of [the property] is permitted." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1017, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Tahoe–Sierra,* 535 U.S. 302, 122 S.Ct. 1465 (distinguishing the normal regulatory action from the regulatory taking based on the removal of all economically viable use). The plaintiff bears the burden of showing that no economically viable use remains. *See Andrus v. Allard,* 444 U.S. 51, 60, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962).

■ Defendant contends first that, because plaintiff's books and records reflect a tax gain when the vessel was sold, plaintiff was not economically harmed by the taking. The fact that there may have been a paper tax gain does not mean the plaintiff did not suffer a temporary taking prior to the vessel's sale, however. In any event, as Ms. Visconty explained, any nominal tax gain was a result of removing the *Atlantic Star* from plaintiff's books. There was no real economic gain to plaintiff.

■ Defendant next contends that the proceeds from an insurance policy preclude recovery. The Lloyd's of London policy on which defendant relies provided insurance against loss of fishing permits. Defendant

has argued throughout this case that plaintiff did not have a property interest in its permits. *American Pelagic I*, 49 Fed.Cl. at 46 (*citing Bradshaw v. United States*, 47 Fed. Cl. 549 (2000); *Hage v. United States*, 35 Fed.Cl. 147 (1996)). It is ironic that it now contends that insurance against loss of those permits prohibits plaintiff's recovery. In any event, the court held that the taking here was the use of plaintiff's boat. *American Pelagic I*, 49 Fed.Cl. at 51.

Defendant's argument misconstrues the purpose of the compensation aspect of the Takings Clause. The Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). That condition is just compensation for that which is taken. The proceeds of an owner's insurance policy covering loss do not constitute just compensation from the government, nor does it mean that the government did not cause a complete diminution in value. The government cannot be the beneficiary of an insurance policy for which it did not pay.[29]

Defendant also argues that any loss suffered by plaintiff is a result of its own business decisions. Defendant would have the court find that because plaintiff did not sell its boat as soon as the 1997 Appropriations Act was passed, any subsequent loss was a result of plaintiff's choices. The facts are otherwise. This argument fails to take into account that the 1997 Appropriation Act and the 1998 Appropriations Act were potentially temporary. It was not until the passage of the 1999 Appropriations Act that the revocation of the plaintiff's permits was permanent. Plaintiff's decision to hold the vessel in the interim, while it attempted to avoid any extension of the permit cancellation, and while it sought to make some profitable use, was not unreasonable. Nor has defendant offered evidence that plaintiff turned down any offers to purchase the *Atlantic Star* after passage of the 1997 Appropriations Act.

Finally, defendant argues that if plaintiff had built a different boat, or outfitted the *Atlantic Star* for a different fishery, plaintiff would not have had such a large loss. This is tantamount to criticizing plaintiff for owning something the government wanted to take. We assume defendant does not seriously advance this argument. In sum, the *Lucas* test is met: plaintiff has established the "extraordinary circumstance[ ] when *no* productive or economically beneficial use" remains. *Lucas*, 505 U.S. at 1017, 112 S.Ct. 2886 (emphasis in original).

## C. Fair Rental Value

■ Unlike a permanent taking, a temporary taking deprives the owner not of its property, but the use of its property for a fixed period of time. The owner is entitled to the "reasonable value of the property's use" during the temporary taking. *United States v. Pewee Coal Co.*, 341 U.S. 114, 117, 71 S.Ct. 670, 95 L.Ed. 809 (1951).

■ When a taking of property occurs, its owner must be compensated in the amount that was lost as a result of the taking. *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (1990) (citing *First English*, 482 U.S. at 319, 107 S.Ct. 2378). It is the duty of the court to determine compensation which places the owner of property "in as good a position pecuniarily as if his property had not been taken." *Yancey*, 915 F.2d at 1543 (quoting *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)). Compensation, however, is limited to what was actually taken by the government and excludes indirect or remote injuries. *See United States v. General Motors Corp.*, 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

■ Unlike a permanent taking in which the court examines the market value of the fee interest prior to and subsequent to the takings period when determining damages, for a temporary taking it is well settled that the appropriate measure of compensation is

---

**29.** In *Shelden v. United States*, 34 Fed.Cl. 355 (1995), the court commented on the collateral source rule as it applied to the taking of plaintiff's mortgage. The court declined to diminish plaintiffs' recovery by the amount of the earthquake insurance which they had purchased on their home. The government could not benefit from the plaintiffs' foresight.

the fair rental value of property. *See, Kimball Laundry Co. v. United States,* 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). *See Also, First English,* 482 U.S. at 314, 107 S.Ct. 2378. Were the difference between the market value of the fee before and after the taking the basis for compensation, "there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy." *Id.* The actual value of the property, the owner's initial investment in that property, and any other factors which go solely to the value of the fee interest are therefore irrelevant for purposes of determining fair rental value.

In general, the fair rental value of a property should be determined by market forces. *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). A hypothetical analysis is undertaken. The court attempts to determine what two parties making a voluntary exchange would have agreed upon, recognizing that the actual exchange was done under compulsion. *Kimball Laundry Co.,* 338 U.S. at 5–6, 69 S.Ct. 1434. However, just compensation may not be reduced to a simple formula, tied solely to available market values. *See United States v. Cors,* 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949). There may be instances in which the "market value furnishes an inappropriate measure of actual value." *General Motors Corp.,* 323 U.S. at 379, 65 S.Ct. 357. In fact, "when the property is of a kind seldom exchanged, [and] it has no 'market price,' . . . recourse must be had to other means of ascertaining value." *Kimball Laundry Co.,* 338 U.S. at 5–6, 69 S.Ct. 1434. In that situation, the court attempts to determine the loss to plaintiff. *See United States v. Commodities Trading Corp.,* 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707 (1950).

Defendant proposes that, because in this case there is no readily ascertainable rental market, plaintiff is left without a remedy under the Takings Clause. Fortunately, the law is not so unreasonable. As explained in *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 256, 66 S.Ct. 574, 90 L.Ed. 652 (1946), "the wrongdoer may not object to the plain-

tiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." *See also Locke v. United States,* 151 Ct.Cl. 262, 267, 283 F.2d 521 (1960). "The ascertainment of value is not controlled by rigid rules or artificial formulae; what is required is a 'reasonable judgment having its basis in a proper consideration of all relevant facts.' " *American–Hawaiian Steamship v. United States,* 129 Ct.Cl. 365, 124 F.Supp. 378 (1954) (citing *The Minnesota Rate Cases,* 230 U.S. 352, 434, 33 S.Ct. 729, 57 L.Ed. 1511 (1913)).

■ Plaintiff bears the burden of proving its loss to a reasonable certainty. *See Foster v. United States,* 2 Cl.Ct. 426, 445 (1983) (citing *United States v. 145.30 Acres of Land,* 385 F.Supp. 699, 702 (W.D.La.1974), *aff'd,* 524 F.2d 1231 (5th Cir.1975)). It is entitled, however, to all reasonable inferences which may be drawn from the evidence. *See Locke,* 151 Ct.Cl. at 267–68, 283 F.2d 521 (1960). Moreover, that the inquiry is based on some conjecture is not fatal. *Yaist v. United States,* 17 Cl.Ct. 246, 257 (1989) (citing *United States v. Silver Queen Mining Co.,* 285 F.2d 506 (10th Cir.1960)). Where there is no market for a piece of property, or one may not be readily discerned, it is the responsibility of the trial court to determine a fair rental value based on other data available. *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1943) ("Where, for any reason, property has no market, resort must be had to other data to ascertain its value.").

Plaintiff must show that there is a demand for the use which it proposes. *See Fordyce v. United States,* 7 Cl.Ct. 591, 600 (1985). The undeveloped nature of a market for large fishing vessels in the western Atlantic required the court to examine the market for similar vessels elsewhere in the world. Plaintiff provided ample fact and expert testimony that permits a comparison of the *Atlantic Star* with production and sale by vessels operating in other areas.

Additionally, plaintiff must show that its use of the property was not a speculative or conjectured use. *See United States v. 320.0*

*Acres of Land,* 605 F.2d 762, 814 (5th Cir. 1979). Here, as discussed *supra,* it requires no speculation to conclude that plaintiff would have successfully used the *Atlantic Star* as a fishing vessel for Atlantic herring and mackerel off the East Coast of the United States.

As explained in *Kimball Laundry,* every takings case involves a counter-factual inquiry—what would willing parties have agreed upon if the government had not intruded, requiring an involuntary exchange. *Kimball Laundry,* 338 U.S. at 6, 69 S.Ct. 1434. The absence of a competitive market, while important, does not destroy the court's ability to find damages in this case. Instead, it requires the court to examine additional evidence, provided in this case by Dr. Miller, about what would have transpired if a market had existed. As discussed above, Dr. Miller's model is based on extensive evidence and sound reasoning. The absence of a real-world market for the rental of the *Atlantic Star* does not render Dr. Miller's model speculative.

Because there was no actual rental market for fishing vessels like the *Atlantic Star,* a working model for a competitive market was necessary. This is what Dr. Miller attempted to construct. As explained above, his model provided the court with a probable revenue stream which would closely approximate the fair rental value of the *Atlantic Star* during the takings period. In a competitive market, the revenue stream that the *Atlantic Star* probably could have achieved is equivalent to the amount that a potential lessee would have been willing pay in order to rent the vessel. Basic economic principles dictate that potential lessees would compete, bidding up to the revenue stream for the *Atlantic Star.* As lessor, then, plaintiff would have been able to realize this rental value but for the taking.

As discussed above, plaintiff put forward a number of highly qualified, competent and reliable witnesses. These witnesses demonstrated that plaintiff could have made a profit from the fishing and subsequent sales of herring and mackerel off the East Coast. The extensive and detailed report from Ms. Visconty more than satisfied plaintiff's bur-

den to show offsetting costs which would have been incurred by the vessel when it was in operation.

Defendant would also have the court find that the component parts of plaintiff's damages model are too theoretical to provide the basis for damages. Specifically, defendant's witness, Mr. Reichle, opined that plaintiff's method of determining prices at which Atlantic herring and mackerel would have been sold during the damages period was speculative. For reasons set out above, however, we do not rely on Mr. Reichle's testimony. Furthermore, plaintiff's expert, Mr. Ellenton, gave a detailed explanation of his pricing method. Far from being speculative, it was based upon years of experience and information published by the Norwegian Seafood Export Council and the Netherlands Central Bureau of Statistics.

Defendant challenges the reasonableness of plaintiff's damages model. Based on Mr. Berdy's testimony, defendant argues that plaintiff's damage claim equates to a 368% return on equity when one begins with what plaintiff invested in the vessel. For the purposes of a temporary taking, however, we are not concerned with plaintiff's initial investment. Neither the purchase price nor the sale price of the *Atlantic Star* have any bearing on the amount to which plaintiff is entitled. This court does not look at the before and after values of a resource in a temporary takings analysis. *Yuba Natural Resources,* 904 F.2d at 1577. Mr. Berdy's return on equity critique therefore fails as a matter of law. In any event the analysis suffers from another problem. Mr. Berdy based this return on equity only on the amount invested by Mrs. Torgersen. He did not include any equity added by Parlevliet and Van der Plas. Thus, his analysis is incomplete.

Defendant does not propose an alternative method of determining damages. In fact, when asked how he would calculate damages, Mr. Berdy outlined the very method which Dr. Miller used.

Finally, defendant contends that plaintiff has simply provided the court with a request for compensation for lost profits. We dis-

agree. Unfortunately, there is no market from which to determine fair rental value. The net income which the *Atlantic Star* would have generated during the takings period simply provides the basis for calculating a fair market rent. *See Pettro v. United States,* 47 Fed.Cl. 136, 153 (2000) (damages for temporary taking of mineral rights based on probable rental value); *Bass Enterprises Production Co. v. United States,* 48 Fed.Cl. 621 (2001) (plaintiff entitled to interest it would have earned if its right to utilize an oil and gas lease had not been taken). Plaintiff's damage model is therefore permissible.

One adjustment is required, however. Plaintiff's damage model is based solely on an assumed production of 75,000 metric tons per year. We held, however, that plaintiff's damages should be limited to an assumed catch of 50,000 metric tons per year. Although we recognize that cost calculations are not uniformly proportionately driven by the amount of the catch, we find a fair approximation of damages would be two thirds of the amount claimed.

## CONCLUSION

We conclude that plaintiff suffered a temporary regulatory taking of all value of its vessel for a twenty month period. It has established a fair rental value of $37,275,952.67. The clerk is directed to enter judgment in that amount. Costs to plaintiff.