SCHALL, Circuit Judge.
 

 The United States appeals the decision of the United States Court of Federal Claims that American Pelagic Fishing Co., L.P. (“American Pelagic”) suffered a taking in violation of the Fifth Amendment to the U.S. Constitution, for which the court awarded damages in the amount of $37,275,952.67.
 
 Am. Pelagic Fishing Co. v. United States,
 
 49 Fed.Cl. 36 (2001) (liability)
 
 (“Am. Pelagic
 
 II”); 55 Fed.Cl. 575 (2003) (damages)
 
 (“Am. Pelagic II
 
 ”). We conclude, however, that American Pelagic did not suffer the taking of a property interest that is legally cognizable under the Fifth Amendment. We therefore reverse the decision with regard to liability, vacate the award of damages, and remand the case to the Court of Federal Claims with the instruction that it enter judgment in favor of the United States.
 

 BACKGROUND
 

 I.
 

 This case involves commercial fishing for mackerel and herring in the Exclusive Economic Zone (“EEZ”) of the United States in the Atlantic Ocean. The EEZ consists of the waters two hundred nautical miles from the coastal boundary of each state.
 
 See
 
 16 U.S.C. § 1811 (2000); Proclamation No. 5030, 48 Fed.Reg. 10,605 (Mar. 14, 1983).
 

 The pertinent facts are not in dispute. Throughout the 1990s, the National Marine Fisheries Service (“NMFS”)
 
 [1]
 
 reported that mackerel and herring stocks in the Atlantic Ocean were at record highs and were substantially underfished.
 
 Am. Pe
 
 
 *1367
 

 lagic I,
 
 49 Fed. Cl. at 39. In 1993, a study commissioned by the U.S. Senate Finance Committee and prepared by the U.S. International Trade Commission concluded that only larger ships could improve the competitive position of the U.S. Atlantic mackerel industry with respect to European competitors.
 
 Mackerel: Competitiveness of the U.S. Industry in Domestic and Foreign Markets,
 
 Inv. No. 332-333, Pub. 2649 (Int’l Trade Comm’n June 1993). In 1994, following a recommendation by the Mid-Atlantic Fishery Management Council (“MAFMC”),
 
 [2]
 
 the NMFS rescinded its potential controls
 
 [3]
 
 over access to the Atlantic mackerel fishery, explaining that stocks were “extremely high” and harvesting low.
 
 Atlantic Mackerel, Squid, and Butterfish Fisheries,
 
 59 Fed.Reg. 49,235 (Dep’t Commerce Sept. 27, 1994) (rescinding the control date of August 13,1992, set forth in
 
 Atlantic Mackerel, Squid, and Butterfish Fisheries,
 
 57 Fed.Reg. 36,384 (Dep’t Commerce Aug. 13, 1992)). In 1996, the MAFMC concluded that
 

 [i]n order to compete in the world bulk market, the U.S. will have to emulate its foreign competitors which harvest, process, and ship mackerel in large quantities so as to take advantage of economies of scale. Currently, the U.S. east coast industry does not have the large vessels necessary to participate in this market....
 

 Annual Quota Specifications for Atlantic Mackerel, Loligo, Illex, and Butterfish for
 
 199712 (MAFMC July 1996).
 

 For 1997, the NMFS established an allowable biological catch of 1.178 million metric tons of Atlantic mackerel, but commercial landings totaled only 15,406 metric tons.
 
 Am. Pelagic I,
 
 49 Fed.Cl. at 39.
 
 [4]
 
 In its draft FMP for Atlantic herring in 1997, which was partially approved by the Secretary in 1999, the NEFMC proposed an allowable biological catch of 300,000 metric tons; yet, commercial landings totaled only 95,715 metric tons.
 
 Id.
 
 at 40.
 

 II.
 

 Lisa Torgersen is the President and sole shareholder of American Pelagic.
 
 Am. Pelagic II,
 
 55 Fed.Cl. at 577. In November 1996, Atlantic Star Fishing Company, American Pelagic’s predecessor, purchased a large, U.S.-flagged hull with the intent of transforming it into a commercial fishing vessel.
 
 Id.
 
 at 579-80. In January 1997, it contracted with a Norwegian shipyard to convert the hull into a freezer trawler — a large, commercial fishing vessel with the capacity to catch all of its own fish, freeze them on board, and offload them for shipping to their final destination.
 
 Id.
 
 at 579 n. 6, 580. The result was the
 
 Atlantic Star,
 
 a vessel 369 feet long, displacing 6,900 gross tons, and having a total of
 
 *1368
 
 13,400 horsepower (about 7,000 horsepower for running the generators for the freezers and the remainder for propulsion).
 
 Id.
 
 at 580. Outfitted with the most sophisticated technology for locating, sorting, and freezing fish year-round, the
 
 Atlantic Star
 
 could safely hold 400 to 500 metric tons of fish.
 
 Id.
 
 at 580-81. American Pelagic’s total investment in the vessel approached $40 million.
 
 Am. Pelagic I,
 
 49 Fed. Cl. at 38.
 

 While the vessel was being outfitted, American Pelagic set about applying for the necessary permits and gear authorizations. Pursuant to 50 C.F.R. § 648.4(a)(5) (1996), the
 
 Atlantic Star
 
 was required to carry on board a valid Atlantic mackerel permit to fish for, possess, or land Atlantic mackerel in or from the EEZ. Because of the potential for incidental bycatch, the
 
 Atlantic Star
 
 also was required to have a Northeast Multispecies (Nonregulated) fish permit.
 
 Id.
 
 § 648.4(a)(1). In April 1997, the Northeast Regional Office of the NMFS reissued both permits to American Pelagic:
 
 [5]
 
 Federal Fisheries Permit # 610018 for,
 
 inter alia,
 
 Atlantic mackerel, expiring December 31, 1997; and Federal Fisheries Permit # 610018 for Northeast Multispecies (Nonregulated), expiring April 30, 1998. In addition, pursuant to 50 C.F.R. § 648.80(d) (1996), on August 28, 1997, the Northeast Regional Office issued to American Pelagic a Gulf of Maine/Georges Bank Midwater Trawl Gear Authorization letter for,
 
 inter alia,
 
 Atlantic herring, expiring April 30,1998.
 
 [6]
 

 Am. Pelagic I,
 
 49 Fed. Cl. at 40.
 

 III.
 

 During 1997, as Ms. Torgersen prepared for commercial operation, opposition to the
 
 Atlantic Star
 
 began to develop.
 
 Id.
 
 Concerns about the size of the vessel and its potential effect on the Atlantic mackerel and herring fisheries were voiced at a joint meeting of the Herring Section of the Atlantic States Marine Fisheries Commission and the NEFMC Herring Committee in March 1997. These concerns subsequently were incorporated into legislation introduced in the U.S. House of Representatives to establish a moratorium on any fishing vessel, in the Atlantic mackerel and herring industries, equal to or greater than 165 feet in length, with an engine of more than 3,000 horsepower.
 
 Id.
 
 at 40-41 (citing H.R. 1855, 105th Cong. (1997)). In September 1997, a similar bill was introduced in the U.S. Senate. The Senate bill would have revoked Atlantic mackerel or herring permits that had been issued to vessels 165 feet or longer with an engine of more than 3,000 horsepower.
 
 Id.
 
 at 41 (citing S. 1192,105th Cong. (1997)).
 

 Despite the fact that neither bill was enacted, Congress passed a rider to an appropriations act that effectively can-celled American Pelagic’s existing permits and authorization letter, and at the same time prevented any further permits from being issued to the
 
 Atlantic Star. Id.
 
 at 41-42 (citing text of Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub.L. No. 105-119, § 616, 111 Stat. 2440, 2518-19 (1997) (“1997 Appropriations Act”)). The following year, Congress enacted the identical provision in another appropriations act,
 
 [7]
 
 and in 1999, it made
 
 *1369
 
 the size limitation and permit revocation permanent.
 
 [8]
 

 Id.
 
 at 42. The NMFS has since promulgated regulations reflecting this prohibition.
 
 [9]
 

 Id.
 
 As a result of the legislation, the
 
 Atlantic Star
 
 was unable to receive a permit to fish in any U.S. fishery within the EEZ; at the time, no other vessel was affected by the legislation.
 
 Id.
 
 at 42, 43.
 

 After the
 
 Atlantic Star’s
 
 permits were cancelled, American Pelagic took the vessel to the Baltic Sea to participate in a research project. During this time, the vessel operated as a “mother ship”: it did not catch fish itself but merely processed the fish caught by other vessels. Because the venture was not profitable, the
 
 Atlantic Star
 
 spent only a few months in the Baltic. Subsequently, American Pelagic took the
 
 Atlantic Star
 
 to Mauritania, off the coast of west Africa, and purchased fishing rights for those waters while maintaining its status as a U.S.-flagged vessel. The vessel and its equipment performed to expectations; however, the lack of fish and warm water temperatures prevented the
 
 Atlantic Star
 
 from being profitable. American Pelagic chose not to reflag the
 
 Atlantic Star
 
 and obtain authorization to fish in a foreign fishery. By April 1999, American Pelagic was operating at a loss. After unsuccessful attempts to secure additional financing, and after rejecting Chapter 11 bankruptcy, American Pelagic sold the
 
 Atlantic Star
 
 to two of its partners on July 6, 1999.
 
 Am. Pelagic II,
 
 55 Fed. Cl. at 582-83.
 

 IV.
 

 American Pelagic brought suit in the Court of Federal Claims in March 1999, alleging that the 1997 and 1998 Appropriations Acts revoking its permits and barring it from receiving future permits effected a temporary taking of the
 
 Atlantic Star. Am. Pelagic I,
 
 49 Fed.Cl. at 44. In its complaint, American Pelagic asserted that it had a property right in its fishery permits and authorizations that was taken by the legislation. Compl. ¶¶ 58, 64. American Pelagic further asserted that the United States had “taken, destroyed, and deprived [American Pelagic] of its compensable, investment backed expectations in the use and operation of the
 
 [Atlantic Star]”
 
 and had “taken all economically viable use” of the vessel.
 
 Id.
 
 ¶¶ 59-60, 65-66. Thus, American Pelagic alleged a taking of its property without just compensation in violation of the Fifth Amendment.
 
 Id.
 
 ¶¶ 61, 67. American Pelagic sought relief in the form of “the fair market value” of its property that had been taken, measured as “the expected net revenues or profit from operation of the
 
 [Atlantic Star
 
 ] in the fisheries of the United States” during the fiscal years 1998 and 1999.
 
 Id.
 
 It estimated its just compensation to be in or around $10 million for each fiscal year, not including pre-or post-judgment interest, damages, costs, and attorneys’ fees.
 
 Id.
 
 “Prayer for Relief” ¶¶ 1-3. In due course, the parties filed cross-motions for summary judgment. On April 4, 2001, the Court of Federal Claims granted summary judgment in favor of
 
 *1370
 
 American Pelagic on the issue of liability.
 
 Am. Pelagic I,
 
 49 Fed. Cl. 36.
 

 The court started from the premise that because licenses and permits are traditionally not protected by the Takings Clause, the
 
 res
 
 potentially taken by the legislation consisted of the
 
 Atlantic Star
 
 itself, which the government conceded to be property for Fifth Amendment purposes.
 
 Id.
 
 at 46. The court then explained, “To determine whether a property right exists independent of the regulatory scheme, it is necessary to decide ‘whether an independent or preexisting right of use under common law applies.’ ”
 
 Id.
 
 at 47 (quoting
 
 Maritrans Inc. v. United States,
 
 40 Fed. Cl. 790, 796 (1998)). In that context, the court determined that
 

 [t]he relevant stick in the bundle in this context is the right to use the
 
 Atlantic Star
 
 to fish, subject to regulation.... We are not confronted here with a property or a use which is inherently dangerous or a nuisance. There is nothing in the nature of a fishing vessel that suggests that any use is totally a matter of governmental grace.... Absent such a built-in limitation, personal property, like' land, comes with an inherent right of use. We note that the right to use is one of the group of rights inhering in the citizen’s relation to [a] physical thing.
 

 Id.
 
 (citations and internal quotation marks omitted). The court thus determined that American Pelagic possessed a property interest “in using [the
 
 Atlantic Star
 
 ] to fish.”
 
 Id.
 
 at 48.
 

 The court then embarked upon a regulatory takings analysis. In its analysis, the court decided that all three factors of the
 
 Penn Central
 
 test weighed in favor of finding that a regulatory taking had occurred: (i) American Pelagic’s investment-backed expectation of participating in the Atlantic mackerel fishery was reasonable; (ii) the degree of economic impact was severe enough to leave the
 
 Atlantic Star
 
 with no commercially viable uses; and (iii) the character of the government action, in purpose and effect, was both retroactive and targeted at American Pelagic.
 
 Id.
 
 at 48-51 (citing
 
 Penn Cent. Transp. Co. v. City of New York,
 
 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).
 

 The parties proceeded to a trial on damages in December 2002.
 
 Am. Pelagic II,
 
 55 Fed.Cl. 575. The court awarded American Pelagic damages in the amount of the fair rental value of the
 
 Atlantic Star.
 
 In the absence of any market for leasing such a vessel for fishing off the east coast of the United States, the court derived a model for fixing the fair rental value based upon a “reasonably established net revenue stream” as presented by American Pelagic, with minor modifications.
 
 Id.
 
 at 584-90, 592-95. Ultimately, the Court of Federal Claims awarded American Pelagic damages in the amount of $37,275,952.67 for what it described as “a temporary regulatory taking of all value of its vessel for a twenty month period.”
 
 [10]
 

 Id.
 
 at 595.
 

 The government has timely appealed the Court of Federal Claims’ decisions on both liability and damages. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).
 

 ANALYSIS
 

 I.
 

 Summary judgment is appropriate only if there is no genuine issue of
 
 *1371
 
 material fact and the moving party is entitled to a judgment as a matter of law. Fed. Cl. R. 56(c);
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 247-48,106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We review a grant of summary judgment by the Court of Federal Claims
 
 de novo
 
 to determine whether it correctly applied this standard.
 
 See Cienega Gardens v. United States,
 
 265 F.3d 1237,1244 (Fed.Cir.2001). We affirm if, when the facts are viewed in the light most favorable to the nonmoving party and doubts are resolved against the movant, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.
 
 Helifix, Ltd. v. Blok-Lok, Ltd.,
 
 208 F.3d 1339, 1345-46 (Fed.Cir.2000). Whether a compensable taking has occurred is a question of law based on factual underpinnings.
 
 Maritrans Inc. v. United States,
 
 342 F.3d 1344, 1350-51 (Fed.Cir.2003) (citing
 
 Wyatt v. United States,
 
 271 F.3d 1090, 1096 (Fed.Cir.2001)). As noted above, in this case, the pertinent facts are not in dispute.
 

 In reviewing a final decision of the Court of Federal Claims after a trial, we review legal conclusions
 
 de novo,
 
 and we review factual findings under the clearly erroneous standard.
 
 Id.
 
 (citing
 
 Glendale Fed. Bank, FSB v. United States,
 
 239 F.3d 1374, 1379 (Fed.Cir.2001)). “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.”
 
 Id.
 
 (citing
 
 United States v. United States Gypsum Co.,
 
 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).
 

 The government challenges both the grant of summary judgment on liability and the award of damages to American Pelagic. Because our ruling on the issue of liability disposes of the case, we do not reach the government’s challenge to the award of damages.
 

 II.
 

 The law generally applicable to takings claims is well settled. The Fifth Amendment to the United States Constitution provides that private property shall not “be taken for public use without just compensation.” U.S. Const, amend. V, cl. 4. The purpose of this prohibition is to prevent “Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.”
 
 Penn Central,
 
 438 U.S. at 123, 98 S.Ct. 2646 (quoting
 
 Armstrong v. United States,
 
 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). Real property,
 
 see Lucas v. S.C. Coastal Council,
 
 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); personal property,
 
 see Andrus v. Allard,
 
 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); and intangible property,
 
 see Ruckelshaus v. Monsanto Co.,
 
 467 U.S. 986, 1003-04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), each may constitute the
 
 res
 
 of a takings claim.
 

 The Supreme Court has recognized that the government may “take” private property either by physical invasion or by regulation.
 
 Lucas,
 
 505 U.S. at 1014-15, 112 S.Ct. 2886. This case involves an alleged regulatory taking. “A ‘regulatory taking may occur when government action, although not encroaching upon or occupying private property, still affects and limits its use to such an extent that a taking occurs.’ ”
 
 Cienega Gardens,
 
 265 F.3d at 1244 (citing
 
 Palazzolo v. Rhode Island,
 
 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)).
 
 [11]
 

 
 *1372
 
 We have developed a two-part test to determine whether a taking has in fact occurred.
 
 See Maritrans,
 
 342 F.3d at 1351 (citing
 
 M & J Coal Co. v. United States,
 
 47 F.3d 1148, 1153-54 (Fed.Cir.1995));
 
 see also Conti v. United States,
 
 291 F.3d 1334, 1339 (Fed.Cir.2002),
 
 cert. denied,
 
 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003). First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment.
 
 Maritrans,
 
 342 F.3d at 1351. “It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.”
 
 Wyatt,
 
 271 F.3d at 1096 (citing,
 
 inter alia, Almota Farmers Elevator Warehouse Co. v. United States,
 
 409 U.S. 470, 473-74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973);
 
 Cavin v. United States,
 
 956 F.2d 1131, 1134 (Fed.Cir.1992)). If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts task is at an end.
 
 Maritrans,
 
 342 F.3d at 1352 (citing
 
 M & J Coal,
 
 47 F.3d at 1154).
 

 Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.
 
 Chancellor Manor v. United States,
 
 331 F.3d 891, 902 (Fed.Cir.2003) (citing
 
 M & J Coal,
 
 47 F.3d at 1153-54). With regard to this second inquiry, we have stated that it is important to decide at the outset whether the alleged taking was “categorical” or not.
 
 Id.
 
 (citing
 
 Rith Energy, Inc. v. United States,
 
 247 F.3d 1355, 1362 (Fed.Cir.2001) (on rehearing)). In
 
 Rith Energy,
 
 we explained the difference between a categorical and a noncategorical taking:
 

 A categorical taking has been defined as one in which “all economically viable use, i.e., all economic value, has been taken by the regulatory imposition.”
 
 Palm Beach Isles Assocs. v. United States,
 
 231 F.3d 1354, 1357 (Fed.Cir.),
 
 modifying
 
 208 F.3d 1374 (Fed.Cir.2000). A categorical taking is distinct from a taking “that is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use.”
 
 Id.
 

 247 F.3d at 1362. When a taking is noncategorical, the court will undertake the fact-based inquiry enumerated in
 
 Penn Central
 
 to evaluate whether the governmental action constituted a compensable taking of the property interest.
 
 Maritrans,
 
 342 F.3d at 1351. The three
 
 Penn Central
 
 factors are (i) the character of the governmental action, (ii) the economic impact of the action on the claimant, and (iii) the extent to which the action interfered with the claimant’s reasonable investment-backed expectations. 438 U.S. at 124, 98 S.Ct. 2646. On the other hand, when the taking is categorical, we have explained that “analyzing whether compensation is due does not require an inquiry into whether the plaintiff had reasonable investment-backed expectations that were defeated by the regulatory measure that gave rise to the takings claim.”
 
 Rith Energy,
 
 247 F.3d at 1362 (citing
 
 Palm Beach Isles Assocs.,
 
 231 F.3d at 1357).
 

 III.
 

 Preliminarily, American Pelagic alleged that it had a property right in its
 
 *1373
 
 “lawfully duly issued fishery permits and authorizations” that was “appurtenant to the use and operation of [American Pelagic’s] fishing vessel, the
 
 [Atlantic Star].”
 
 Compl. ¶¶ 58, 64; Br. Pl.-Appellee at 27-29. According to American Pelagic, this property right was taken by the United States because the fishery permits and authorization letter had already been issued when the 1997 Appropriations Act was passed, and at the time, the NMFS lacked the discretion not to renew them. Br. Pl.-Appellee at 27-29. The Court of Federal Claims concluded, however, that no such property right existed: “Licenses or permits are traditionally treated as not protected by the Takings Clause because they are created by the government and can be cancelled by the government and normally are not transferable.”
 
 Am. Pelagic I,
 
 49 Fed. Cl. at 46.
 

 On appeal, American Pelagic reasserts its contention that it had a legally cognizable property interest in its lawfully issued fishing permits and authorization letter. First, it argues that the permits and authorization letter were mandatory, rather than discretionary.
 
 See Foss v. Nat’l Marine Fisheries Serv.,
 
 161 F.3d 584, 588 (9th Cir.1998) (finding, for purposes of a procedural due process claim, a constitutionally protectible property interest in a fishing quota permit from the NMFS because the NMFS had no discretion to deny a permit application if regulatory requirements were met). According to American Pelagic, the only grounds for denying their issuance or renewal were incomplete, late, or altered applications, or the failure to meet eligibility requirements, none of which applied in the case of the
 
 Atlantic Star.
 
 50 C.F.R. § 648.4(e), (i). American Pelagic also argues that the permits could only have been revoked or suspended for a specified “offense” or for failure to pay a penalty, neither of which occurred in this case.
 
 Id.
 
 § 648.4(m); 15 C.F.R. § 904.301(a) (1997).
 

 The government responds that American Pelagic did not have a property interest in its fishery permits. In support of its position, it cites
 
 Conti,
 
 291 F.3d at 1341, which concluded that a swordfishing permit did not confer a property interest for purposes of the Takings Clause. The government explains that American Pelagic’s permits were not transferable or assignable, 50 C.F.R. § 648.4(k);
 
 [12]
 
 that they did not confer exclusive fishing privileges; and that they could be revoked, suspended, or modified by the government,
 
 id.
 
 § 648.4(h), (m).
 
 [13]
 
 In addition, the government distinguishes a constitutionally protected right to a permit under a due process analysis from a compensable property right under a Takings Clause analysis; according to the government, the two are not coterminous. The government points out that in
 
 Foss,
 
 upon which American Pelagic relies, the court actually engaged in a procedural due process analysis, not a Fifth Amendment takings analysis. The government also points out that 15 C.F.R. § 904.301(a), upon which American Pelagic relies for the mandatory nature of its per
 
 *1374
 
 mits, specifically states that “Nothing in this subpart precludes sanction or denial of a permit for reasons not relating to enforcement.”
 

 We conclude that American Pelagic did not and could not possess a property interest in its fishery permits and authorization letter. In
 
 Conti,
 
 we explained that because he could not assign, sell, or transfer his swordfishing permit, because it did not confer exclusive fishing privileges, and because the government at all times retained the right to revoke, suspend, or modify it, Paul Conti did not possess a property interest in his permit. 291 F.3d at 1341-42. This “absence of crucial indicia of a property right, coupled with the government’s irrefutable retention of the right to suspend, revoke, or modify” the swordfishing permit “compels the conclusion that the permit bestowed a revocable license, instead of a property right.”
 
 Id.
 
 at 1342. The same reasoning extends to American Pelagic’s permits and authorization letter. There is simply no contention that American Pelagic had the authority to assign, sell, or transfer its permits and authorization letter,
 
 [14]
 
 nor that it was granted exclusive privileges to fish for Atlantic mackerel and herring in the EEZ. American Pelagic distinguishes its permits from Mr. Conti’s only by alleging that the government could not refuse to issue or reissue, revoke, modify, or suspend them in the absence of specified conditions. As the government notes, however, the regulation upon which American Pelagic relies specifically provides that “Nothing in this subpart precludes sanction or denial of a permit for reasons not relating to enforcement.” 15 C.F.R. § 904.301(a). This language preserved the government’s right to deny or sanction the permits and authorization letter issued to the
 
 Atlantic Star.
 
 The conditions we set forth in
 
 Conti
 
 are therefore met. We agree with the Court of Federal Claims that American Pelagic did not possess a property interest in its fishing permits and authorization letter.
 

 IV.
 

 American Pelagic’s main contention in the Court of Federal Claims was that the 1997, 1998, and 1999 Appropriations Acts, as implemented in 50 C.F.R. pt. 648, effected a taking of the use of the
 
 Atlantic Star
 
 for fishing in the Atlantic mackerel and herring fisheries in the EEZ.
 
 [15]
 
 Compl. ¶¶ 57-58, 60-61. Specifically, American Pelagic argued that, in fiscal years 1998 and 1999, the revocation of its permits “prohibited [American Pelagic’s] use of the
 
 [Atlantic Star
 
 ] for its intended operation in the Atlantic mackerel and herring fisheries of the United States, and any other fishery of the United States ... and has taken the expected net revenues or profits [American Pelagic] would have earned and
 
 *1375
 
 received from use and operation of the
 
 [Atlantic Star
 
 ] ....”
 
 Id.
 
 ¶¶ 57, 63;
 
 see also id.
 
 ¶¶ 60, 66 (“United States has taken, destroyed, and deprived [American Pelagic] of its compensable investment backed expectations in the use and operation of the ATLANTIC STAR ... and has taken all economically viable use of the
 
 [Atlantic Star
 
 ].... ”); Br. Pl.-Appellee at 20-27.
 

 American Pelagic asserted that there was either a categorical or a noncategorical regulatory taking. According to American Pelagic, a temporary categorical taking occurred because the revocation of American Pelagic’s permits and authorizations deprived the
 
 Atlantic Star
 
 of all economically beneficial use during the takings period. In the alternative, American Pelagic contended that analysis of each of the
 
 Penn Central
 
 factors established that a temporary noncategorical regulatory taking occurred.
 

 The Court of Federal Claims concluded that American Pelagic did in fact possess a property interest in the use of the
 
 Atlantic Star
 
 to fish in the Atlantic mackerel and herring fisheries in the EEZ, and that this right was taken by the revocation of its permits and authorization letter.
 
 Am. Pelagic I,
 
 49 Fed.Cl. at 44-52. The court first determined that the Takings Clause applies to both tangible and intangible personalty.
 
 Id.
 
 at 45-46. It then turned to the matter of identifying the property interest allegedly taken: “In this case, from the standpoint of traditional property concepts, the res potentially taken by the government was the ship itself.”
 
 Id.
 
 at 46. However, the court recognized that the
 
 Atlantic Star
 
 itself was not taken nor destroyed; rather, restrictions were placed upon its use.
 
 Id.
 
 Relying on
 
 Lucas
 
 for the proposition that compensation is owed when government “so completely destroys the beneficial uses of property that it is, in effect idled,” the court distilled the existence of a property interest to a single question: “[A]re the uses prohibited within the bundle of rights otherwise inherent in the vessel?”
 
 Id.
 

 The court answered: “To determine whether a property right exists independent of the regulatory scheme, it is necessary to decide ‘whether an independent or preexisting right of use under common law applies.’ ”
 
 Id.
 
 at 47 (quoting
 
 Maritrans,
 
 40 Fed. Cl. at 796, and citing
 
 Mitchell Arms, Inc. v. United States,
 
 7 F.3d 212, 217 (Fed.Cir.1993)). While acknowledging that the use of the
 
 Atlantic Star
 
 to fish in the EEZ was entirely dependent upon a regulatory scheme, the court emphasized that the use (fishing) was not inherently dangerous, a nuisance, or “totally a matter of governmental grace.”
 
 Id.
 
 Thus, the court concluded that “the right to use is one of the group of rights inhering in the citizen’s relation to [a] physical thing. Inherent in the ownership of vessels is the right to use them.”
 
 Id.
 
 (internal quotation marks and citations omitted). The court thus distinguished the nondangerous use of the
 
 Atlantic Star
 
 for fishing in the EEZ from the use of spent plutonium for nuclear fission,
 
 Allied-Gen. Nuclear Servs. v. United States,
 
 839 F.2d 1572 (Fed.Cir.1988), and the importation of semiautomatic assault rifles into the United States for sale,
 
 Mitchell Arms,
 
 7 F.3d 212.
 
 Am. Pelagic I,
 
 49 Fed. Cl. at 47. Finally, the court distinguished
 
 Conti
 
 on the ground that the restriction there was limited to- a particular use of the claimant’s boat (fishing for swordfish using drift gillnets) and did not, as the court found in this case, restrict all economically beneficial uses. Nor was there any allegation, as there is here, that Mr. Conti was being targeted by the legislation that banned the use of drift gillnets for swordfishing.
 
 Id.
 
 at 48. Accordingly, the court concluded that because “[f]ishing as a livelihood is not a creation of the government ... [American Pelagic] possessed a property interest in
 
 *1376
 
 using its vessel to fish, albeit subject to the regulatory regime.”
 
 Id.
 

 Having found a cognizable property interest, the court went on to determine that each of the
 
 Penn Central
 
 factors was satisfied.
 
 Id.
 
 at 48-51. The court concluded that from the time the 1997 Appropriations Act was passed until the time that American Pelagic sold the
 
 Atlantic Star,
 
 the government “took [American Pelagic’s] property interest in the use of its vessel to fish for Atlantic mackerel in the EEZ.... ”
 
 Id.
 
 at 51.
 

 V.
 

 A.
 

 On appeal, the government challenges the grant of summary judgment on liability in favor of American Pelagic. The government starts from the premise that in order for a taking claim to succeed, what must be taken is one of the sticks in the bundle of rights that defines the owner’s relationship to the
 
 res.
 
 From there, it argues that the Court of Federal Claims erred in holding that American Pelagic possessed a property interest in the use of the
 
 Atlantic Star
 
 to fish for Atlantic mackerel and herring in the EEZ, even subject to government regulation. The government urges that no property interest exists in an individual’s investment in uses of personalty that are dependent upon discretionary permit issuances by the government. Br. Def.-Appellant at 22.
 

 American Pelagic recognizes that one of the sticks in the bundle of property rights that the owner of property acquires with his title must be proscribed in order for a taking to occur. Br. Pl.-Appellee at 21-27; Supp. Br. Pl.-Appellee at 2. However, because the use of the
 
 Atlantic Star
 
 to fish was lawful not only under traditional property and nuisance principles,
 
 Lucas,
 
 505 U.S. at 1030,112 S.Ct. 2886, but also under the regulatory regime by which its permits were issued, American Pelagic argues that use of the vessel to fish for Atlantic mackerel and herring constituted a legally cognizable property interest. In contrast to
 
 Mitchell Arms,
 
 in which we explained that the ability to sell a firearm does not inhere in ownership of the firearm itself upon the owner’s acquisition, American Pelagic asserts that the right to fish for Atlantic mackerel and herring in the EEZ did inhere in its ownership of the
 
 Atlantic Star.
 

 Thus, the question we must answer is this: Was the right to fish for Atlantic mackerel and herring in the EEZ a legally cognizable property interest such that it was a stick in the bundle of property rights that American Pelagic acquired as the owner of the
 
 Atlantic Star?
 
 For the reasons that follow, we conclude that it was not. Consequently, American Pelagic’s takings claim fails.
 

 B.
 

 We determine whether an asserted right is one of the rights in the bundle of sticks of property rights that inheres in a
 
 res
 
 by looking to “existing rules or understandings” and “background principles” derived from an independent source such as state, federal, or common law.
 
 Lucas,
 
 505 U.S. at 1030, 112 S.Ct. 2886 (quoting
 
 Bd. of Regents of State Colls. v. Roth,
 
 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).
 
 [16]
 
 These rights
 
 *1377
 
 define the dimensions of the requisite property interest for purposes of establishing a takings claim. Significantly, the Supreme Court has distinguished personal property from real property:
 

 And in the case of personal property, by reason of the State’s traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property’s only economically productive use is sale or manufacture for sale).
 
 See Andrus v. Allard,
 
 444 U.S. 51, 66-67,100 S.Ct. 818, 62 L.Ed.2d 210 (1979).
 

 Lucas,
 
 505 U.S. at 1027, 112 S.Ct. 2886. Thus, it is conceivable that the owner of personal property, as opposed to land, may have a lower expectation that he has a property interest in using his personal property for commercial dealings. Moreover, there is a distinction between simply not being disturbed in the particular use of one’s property and having the
 
 right
 
 to that use of the property. Clearly, in order for there to be a cognizable property interest sufficient to support a takings claim, the latter must be true. Thus, simply because many commercial fishermen were not affected by the 1997, 1998, and 1999 Appropriations Acts and continued to fish for Atlantic mackerel and herring in the EEZ, it does not follow that those fishermen had a
 
 property interest
 
 in the use of their vessels to fish in the EEZ. They simply were enjoying a use of their property that the government chose not to disturb. In other words, use itself does not equate to a cognizable property interest for purposes of a takings analysis.
 

 C.
 

 Up until the 1960s, most nations with coastlines, including the United States, had declared jurisdiction over territorial seas of three miles and conservation zones of twelve miles.
 
 See, e.g.,
 
 Bartlett Act, Pub.L. No. 88-308, 78 Stat. 194 (1964) (previously codified at 16 U.S.C. §§ 1081-86) (three-mile territorial sea jurisdiction); Pub.L. No. 89-658, 80 Stat. 908 (1966) (previously codified at 16 U.S.C. §§ 1091-94) (three-to twelve-mile conservation zone jurisdiction) (both repealed by the Magnuson Act, title IV, § 402(a), (b), 90 Stat. at 360). Similarly, prior to the enactment of the Magnuson Act, a state could regulate its state-registered vessels and its citizens while fishing in what is now the EEZ pursuant to a line of Supreme Court cases culminating in
 
 Skiriotes v. Florida,
 
 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941). Countries generally attempted to achieve conservation of fish by entering into international fishing agreements (to approximately twenty of which the United States was a party).
 
 See
 
 S.Rep. No. 94-416, n. 3, app. 1. In 1976, however, in response to the third session of the United Nations Convention on the Law of the Sea (“UNC-LOS”), which provided for coastal nation management of resources within a two-hundred-mile zone, Congress enacted the Magnuson Act:
 

 Fishery conservation zone
 

 There is established a zone contiguous to the territorial sea of the United States to be known as the fishery conservation zone. The inner boundary of the fishery conservation zone is a line coterminous with the seaward boundary of each of the coastal States, and the outer boundary of such zone is a line drawn in such a manner that each point on it is 200 nautical miles from the base
 
 *1378
 
 line from which the territorial sea is measured.
 

 16 U.S.C. § 1811 (1976).
 

 Subsequently, in a presidential proclamation, President Reagan established the EEZ and assumed sovereign rights for the United States over this two-hundred-mile zone. Quoting from UNCLOS, Dec. 10, 1982, art. 56, ¶ 1, 21 I.L.M. 1245, 1280,
 
 [17]
 
 he announced:
 

 Within the Exclusive Economic Zone, the United States has, to the extent permitted by international law, (a) sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources, both living and nonliving, of the seabed and subsoil and the superjacent waters and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds....
 

 Proclamation No. 5030, 48 Fed.Reg. 10,-605. It is clear from this language that, at least as of' 1983, the United States had asserted sovereignty with respect to the exploration, exploitation, conservation, and management of the natural resources of the EEZ. This assertion of sovereignty was subsequently codified in the 1986 amendments to the Magnuson Act:
 

 United States sovereign rights to fish and fishery management authority
 

 (a) In the exclusive economic zone. Except as provided in section 102 [16 USCS 1812], the United States claims, and will exercise in the manner provided for in this Act, sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone.
 

 (b) Beyond the exclusive economic zone. The United States claims, and will exercise in the
 
 manner
 
 provided for in this Act, exclusive fishery management authority over the following:
 

 (1) All anadromous species throughout the migratory range of each such species beyond the exclusive economic zone; except that that management authority does not extend to any such species during the time they are found within any waters of a foreign nation.
 

 (2) All Continental Shelf fishery resources beyond the exclusive economic zone.
 

 Act of Nov. 14, 1986, Pub.L. No. 99-659, tit. I, § 101(b), 100 Stat. 3706, 3706-07 (codified as amended at 16 U.S.C. § 1811 (2000)). Thus, Congress explicitly assumed “sovereign rights and exclusive fishery management authority over all fish” in the EEZ. This assumption of sovereignty indisputably encompasses all rights to fish in the EEZ.
 

 The various provisions of the Magnuson Act are consistent with this exercise of U.S. sovereignty over the EEZ and the fish and resources within it. Enacted to “take immediate action to conserve and manage the fishery resources found off the coast of the United States,” 16 U.S.C. § 1801(b)(1), the Magnuson Act established national standards by which fishery “conservation and management” plans would be developed,
 
 id.
 
 § 1851(a). Congress further established under the auspices of the Secretary Regional Fishery Management Councils, including the NEFMC and the MAFMC, with direct authority over the fisheries within their respective geographic regions.
 
 Id.
 
 § 1852. As noted above, each council is charged with the obligation, among others, of preparing and submitting FMPs for the fisheries within its authority.
 
 Id.
 
 § 1852(h). Congress required the FMPs to contain
 

 
 *1379
 
 conservation and management measures ... necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery . . . .
 

 Id.
 
 § 1853(a)(1)(A). Significantly, the Magnuson Act bars foreign fishing in the EEZ entirely, except as the United States permits,
 
 id.
 
 § 1821, and authorizes the regional councils to require federal permits for U.S. fishermen to fish in any fishery within the EEZ,
 
 id.
 
 § 1853(b)(1). Thus, in addition to asserting U.S. sovereignty over the EEZ and the fish and resources therein, Congress also erected an elaborate framework by which the fisheries in the EEZ would be managed under the oversight of the Secretary.
 

 Pursuant to the Magnuson Act, the “conservation and management of the EEZ” belongs to the sovereign, and this necessarily includes the right to fish in the zone. Moreover, there is no language in the statute to the effect that any fishing privileges that are granted pursuant to the Magnuson Act vest in their owners a property right protected by the Fifth Amendment.
 
 See Foss,
 
 161 F.3d at 588 (“[T]he language of the Magnuson Act does not confer any claim of entitlement or property rights.”);
 
 see also Parravano v. Babbitt,
 
 861 F.Supp. 914, 928 (N.D.Cal.1994) (“Thus, the Magnuson Act confers on the Secretary of Commerce authority to manage the fishery resources in the EEZ for conservation. It does not confer on commercial fishermen any right or title in the fishery resources under the Department of Commerce’s authority.”),
 
 aff'd,
 
 70 F.3d 539 (9th Cir.1995),
 
 cert. denied,
 
 518 U.S. 1016, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996).
 

 Because it was already in place by the time American Pelagic purchased the
 
 Atlantic Star,
 
 the Magnuson Act was an “existing rule” or “background principle[ ]” of federal law that inhered in American Pelagic’s title to the vessel.
 
 Lucas,
 
 505 U.S. at 1029-30, 112 S.Ct. 2886. In the words of the Supreme Court, as far as ownership of the
 
 Atlantic Star
 
 was concerned, the sovereign rights of the United States in the EEZ “inhere[d] in the title itself, in the restrictions that background principles of the [federal government’s] law ... already place[d] upon ... ownership.”
 
 Id.
 
 at 1029, 112 S.Ct. 2886 (discussing restrictions on real property). It was against this framework of existing federal restrictions on fishing in the EEZ that American Pelagic invested in the
 
 Atlantic Star.
 
 As of 1996, when the
 
 Atlantic Star
 
 was purchased, the Magnuson Act and the attendant regulatory scheme precluded any permitted fisherman from possessing a property right in his vessel to fish in the EEZ. The revocation of American Pelagic’s permits, therefore, did not “go[ ] beyond what the relevant background principles would dictate.”
 
 Id.
 
 at 1030, 112 S.Ct. 2886.
 

 The Magnuson Act is consistent with the historical role played by the sovereign, state or federal, with respect to its waters. As early as 1876, the Supreme Court concluded that
 

 [t]he principle has long been settled in this court, that each State owns the beds of all tide-waters within its jurisdiction, unless they have been granted away. In like manner, the States own the tidewaters themselves, and the fish in them, so far as they are capable of ownership while running.
 

 McCready v. Virginia,
 
 94 U.S. 391, 394, 24 L.Ed. 248 (1876) (citations omitted);
 
 see also, e.g., State v. Leavitt,
 
 105 Me. 76, 72 A. 875, 876 (1909) (“It is, therefore, settled law that each State, unless it has parted with title ... owns the bed of all tidal waters within its jurisdiction, and as well, the tide waters themselves and the fish in
 
 *1380
 
 or under them, so far as they are capable of ownership.... It is in fact a property right....”).
 

 We are not persuaded by American Pelagic’s contention that there exists a historical common law right to use vessels to fish in the EEZ that was not abrogated by the Magnuson Act. American Pelagic points to language in the Magnuson Act that Congress was authorizing “no impediment to, or interference with, recognized legitimate uses of the high seas, except as necessary for the conservation and management of fishery resources.... ” 16 U.S.C. § 1801(c)(2). Plainly, rendering the ability to fish in the EEZ a matter of governmental permission, rather than a property right, is “necessary for the conservation and management of fishery resources ....”
 
 Id.
 
 The language itself thus explicitly carves out from the “legitimate uses” those involved in the conservation and management of fishery resources. Additionally, the phrase “conservation and management” is broadly defined in the statute to include,
 
 inter alia,
 
 “all of the rules, regulations, conditions, methods, and other measures ... which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment....”
 
 Id.
 
 § 1802(5) (2000). The right to use the
 
 Atlantic Star
 
 to fish for mackerel and herring unquestionably implicates the conservation and management of fishery resources. Accordingly, we conclude that the Magnuson Act directly assumes for the federal government sovereignty over the right to fish for Atlantic mackerel and herring in the EEZ. As American Pelagic itself notes, the Magnuson Act expressly asserts the United States’ “sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish” within the EEZ.
 
 Id.
 
 § 1801(b)(1). The statute does not explicitly, or implicitly, preserve any potentially pre-existing common law right to fish in the EEZ.
 
 [18]
 

 Neither are we persuaded by American Pelagic’s reliance on President Reagan’s Proclamation No. 5030, which states that the establishment of the EEZ “does not change existing United States policies concerning the continental shelf, marine mam
 
 *1381
 
 mals and fisheries.... ” 48 Fed.Reg. at 10,605. The short answer is that “existing United States policies” included those “policies” enshrined in the Magnuson Act itself, which predated Proclamation No. 5030.
 
 [19]
 
 In sum, no right to fish in the EEZ inhered in American Pelagic’s title when it acquired the
 
 Atlantic Star.
 
 Because the right to use the vessel to fish in the EEZ was not inherent in its ownership of the
 
 Atlantic Star,
 
 American Pelagic did not suffer the loss of a property interest for purposes of the Takings Clause when its Atlantic mackerel and herring permits were revoked.
 

 Our conclusion is consistent with
 
 Mitchell Arms
 
 and
 
 Conti.
 
 In the first case, Mitchell Arms, Inc. (“Mitchell Arms”) filed suit in the United States Claims Court alleging that the decision of the Bureau of Alcohol, Tobacco, and Firearms to revoke permits allowing the importation and sale of semi-automatic assault rifles constituted a taking of its right to use the permits for those purposes.
 
 Mitchell Arms,
 
 7 F.3d at 215. The Claims Court dismissed Mitchell Arms’ complaint under its Rule 12(b)(4) for failure to state a claim upon which relief could be granted.
 
 Id.
 
 The court concluded that neither the permits themselves nor Mitchell Arms’ expectations arising from the combination of the permits and its contract to purchase the firearms from a foreign party gave rise to a property interest for purposes of the Fifth Amendment’s Takings Clause.
 
 Id.
 
 Mitchell Arms appealed the court’s decision and we affirmed. In our decision, we characterized Mitchell Arms’ claim as follows: “that a property interest was created when it agreed to purchase the firearms with an expectation of importing them under the issued permits.”
 
 Id.
 
 We agreed with the Court of Federal Claims, however, that no taking had occurred, for we determined that Mitchell Arms had failed to assert a property interest protected by the Fifth Amendment.
 
 Id.
 
 at 215-17. We stated that the right to sell assault weapons in domestic commerce was not “a right inherent in plaintiffs ownership of [the] weapons.”
 
 Id.
 
 (quoting
 
 Mitchell Arms, Inc. v. United States,
 
 26 Cl.Ct. 1, 6 (1992)).
 

 The plaintiff in
 
 Conti
 
 was Paul Conti, a swordfisherman. Mr. Conti was the owner of the
 
 F/V Providenza,
 
 a vessel that he used to fish for swordfish in the Atlantic Swordfish fishery using drift gillnets. Mr. Conti filed suit in the Court of Federal Claims alleging that the government’s 1999 ban on harvesting swordfish using drift gillnets constituted a regulatory taking of his swordfishing permit, the
 
 Providenza,
 
 and his gillnet gear without just compensation, in violation of the Fifth Amendment. 291 F.3d at 1337. Mr. Conti contended that, while he still was in possession of his permit, the
 
 Providenza,
 
 and his gear, there had been taken from him the ability to use those things in a particular way: to fish for swordfish in the Atlantic Swordfish fishery using drift gillnets.
 
 Id.
 
 at 1340. The Court of Federal Claims dismissed Mr. Conti’s complaint for failure to state a claim upon which relief could be granted. The court determined,
 
 inter alia,
 
 that continued use of Mr. Conti’s property for harvesting swordfish with drift gillnets did
 
 *1382
 
 not constitute a compensable property interest.
 
 See Conti v. United States,
 
 48 Fed. Cl. 532, 539 (2001) (“The ability to use gillnets to harvest swordfish is not a right inherent in holding .a permit nor in the ownership of the gear or the vessel.”).
 

 Mr. Conti appealed the dismissal of his complaint, and we affirmed. We did so on two grounds. Relying on
 
 Andrus v. Allard,
 

 [20]
 
 we concluded that Mr. Conti’s “continuing ability to sell the vessel and the gear, fish in a different fishery, or put both the nets and vessel to other uses” precluded us from ruling that a regulatory taking had occurred.
 
 Conti,
 
 291 F.3d at 1343. We also stated that Mr. Conti’s takings claim failed “for an additional reason.”
 
 Id,
 
 at 1345 n. 8. After noting that Mr. Conti’s ability to use his vessel and gear to catch swordfish using drift gillnets was dependent upon a revocable permit, we pointed out that his case was analogous to
 
 Mitchell Arms:
 

 In
 
 Mitchell Arms, Inc. v. United States,
 
 7 F.3d 212, 217 (Fed.Cir.1993), we rejected the claim that the Bureau of Alcohol, Tobacco, and Firearms’ decision to revoke a permit allowing the importation and sale of certain firearms constituted a taking of the claimant’s right to use the permit for those purposes. We stated: “Mitchell’s ability to import the rifies and sell them in the United States was at all times entirely subject to the exercise of ATF’s regulatory power. Consequently, any expectation which arose on Mitchell’s part as a result of the import permits did not constitute a property right protected by the Fifth Amendment.” 7 F.3d at 217. Likewise, the drift gillnet regulation at issue here has banned a particular use of Mr. Con-ti’s vessel and gear “which was not inherent in its ownership” and was “totally dependent upon the ... permit issued by” the government. Id.
 

 Id.
 

 Mitchell Arms
 
 and
 
 Conti
 
 control this case. What allegedly was taken in
 
 Mitchell Arms
 
 was the right to import firearms and sell them in domestic commerce. What allegedly was taken in
 
 Conti
 
 was the right to harvest swordfish in the Atlantic Swordfish fishery using drift gillnets. In each case, the takings claim failed because what allegedly was taken was not one of the sticks in the bundle of rights that inhered in ownership of the underlying
 
 res:
 
 in
 
 Mitchell Arms,
 
 certain firearms; in
 
 Conti,
 
 a fishing vessel. American Pelagic is in the same situation as the plaintiffs in
 
 Mitchell Arms
 
 and
 
 Conti.
 
 As discussed above, because the Magnuson Act assumed sovereignty for the United States over the
 
 *1383
 
 management and conservation of the resources located in the EEZ, and specifically over fishery resources, American Pelagic did not have, as one of the sticks in the bundle of property rights that it acquired with title to the
 
 Atlantic Star,
 
 the right to fish for Atlantic mackerel and herring in the EEZ. American Pelagic thus did not possess the property right that it asserts formed the basis for its takings claim. In the absence of that property right, its claim is fatally defective.
 
 [21]
 

 CONCLUSION
 

 For the foregoing reasons, we reverse the holding of
 
 American Pelagic I
 
 that the revocation of American Pelagic’s permits and authorization letter constituted a taking under the Fifth Amendment. We therefore vacate the award of damages in
 
 American Pelagic II.
 
 The case is remanded to the Court of Federal Claims with the instruction that it enter judgment in favor of the United States.
 

 COSTS
 

 Each party shall bear its own costs.
 

 REVERSED, VACATED, and REMANDED
 

 [1]
 

 . The Magnuson-Stevens Fishery Conservation and Management Act, Pub.L. No. 94-265, 90 Stat. 331 (1976) (codified at 16 U.S.C. §§ 1801-1883) ("Magnuson Act”), confers federal management authority over marine fishery resources upon the Secretary of Commerce ("Secretary”) and the NMFS, a subunit of the National Oceanic and Atmospheric Administration, which is an agency within the Department of Commerce ("Commerce”).
 
 See Am. Pelagic I,
 
 49 Fed. Cl. at 38-39.
 

 [2]
 

 . The MAFMC is one of eight regional fishery councils charged with developing fishery management plans for fisheries within the EEZ in accordance with the standards set forth in the Magnuson Act.
 
 See
 
 16 U.S.C. § 1851. The MAFMC has management responsibility for Atlantic mackerel, while the New England Fishery Management Council ("NEFMC”) has management responsibility for Atlantic herring. Once a Fishery Management Plan ("FMP”) is approved by the Secretary, it is promulgated by the NMFS. During the relevant time period in 1997, an official FMP was in place for the Atlantic mackerel fishery, but only a preliminary FMP was in place for the Atlantic herring fishery.
 
 Am. Pelagic I,
 
 49 Fed. Cl. at 39.
 

 [3]
 

 . A "control date” provides notice to anyone subsequently entering a fishery that , he is not assured of continued participation in the fishery should a limited entry scheme be implemented.
 
 See, e.g., Atlantic Mackerel, Squid, and Butterfish Fisheries,
 
 57 Fed.Reg. 36,384 (Dep’t Commerce Aug. 13, 1992).
 

 [4]
 

 . The government's interrogatory responses indicate that commercial landings of Atlantic mackerel in 1997 totaled 15,406 metric tons, not 15,706 as the Court of Federal Claims stated in
 
 Am. Pelagic I,
 
 49 Fed.Cl. at 39.
 

 [5]
 

 . Initially, the permits were issued to the Atlantic Star Fishing Company on February 5, 1997.
 
 Am. Pelagic I,
 
 49 Fed.Cl. at 40.
 

 [6]
 

 . American Pelagic was required to carry this authorization letter because it planned to harvest fish with midwater trawl gear of mesh size less than that normally required by the regulations. 50 C.F.R. § 648.80(d).
 

 [7]
 

 . Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1999, Pub.L. No. 105-277, tit. II, § 202, 112 Stat. 2681, 2681-618 (1998) ("1998 Appropriations Act”).
 

 [8]
 

 . 1999 Emergency Supplemental Appropriations Act, Pub.L. No. 106-31, § 3025, 113 Stat. 57, 100-101 (1999) ("1999 Appropriations Act") (amending section 617 of the 1998 Appropriations Act).
 

 [9]
 

 .
 
 See Fisheries of the Northeastern United States,
 
 64 Fed.Reg. 57,587 (Dep’t Commerce Oct. 26, 1999) (revising 50 C.F.R. pt. 648 and imposing size and power limitations on vessels in the Atlantic mackerel fishery);
 
 Magnuson-Stevens Fishery Conservation and Management Act Provisions, 65
 
 Fed.Reg. 77,450 (Dep’t Commerce Dec. 11, 2000) (revising 50 C.F.R. pt. 648 and imposing size and power limitations on vessels in the Atlantic herring fishery).
 

 [10]
 

 . In
 
 Am. Pelagic II,
 
 the court also affirmed its previous analysis of the three
 
 Penn Central
 
 factors in light of
 
 Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency,
 
 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), which issued after
 
 Am. Pelagic I
 
 and which reaffirmed that the
 
 Penn Central
 
 analysis is the proper way to address whether a temporary regulatory taking has occurred. 55 Fed.Cl. at 590-91 (quoting
 
 Tahoe-Sierra,
 
 535 U.S. at 335, 122 S.Ct. 1465).
 

 [11]
 

 . American Pelagic alleged a temporary, as opposed to a permanent, taking of its property interest. Temporary takings are not different in kind from permanent takings — a temporary taking simply occurs when what would otherwise be a permanent taking is temporally cut short.
 
 Wyatt,
 
 271 F.3d at 1097. "The essential element of a temporary
 
 *1372
 
 taking is a finite start and end to the taking.”
 
 Id.
 
 In this case, the time period of the alleged taking ran from November 26, 1997, the date upon which American Pelagic’s permits and authorization letter were revoked in the 1997 Appropriations Act, to July 6, 1999, the date on which the
 
 Atlantic Star
 
 was sold.
 
 See Am. Pelagic II,
 
 55 Fed. Cl. at 576; Compl. ¶ 57.
 

 [12]
 

 . Section 648.4(k) provides: "A permit issued under this part is not transferable or assignable. A permit will be valid only for the fishing vessel, owner and/or person for which it is issued.” 50 C.F.R. § 648.4(k).
 

 [13]
 

 . Section 684.4(h) provides: "A permit will continue in effect unless it is revoked, suspended, or modified under 15 CFR part 904, or otherwise expires, or ownership changes, or the applicant has failed to report any change in the information on the permit application to the Regional Administrator as specified in paragraph (f) of this section.”
 
 Id.
 
 § 648.4(h). Section 684.4(m) provides: "The Assistant Administrator may suspend, revoke, or modify, any permit issued or sought under this section. Procedures governing enforcement-related permit sanctions or denials are found at subpart D of 15 CFR part 904.”
 
 Id.
 
 § 648.4(m).
 

 [14]
 

 . Although American Pelagic contends that its permits were potentially transferable to future owners of the
 
 Atlantic Star,
 
 it does not contend that those permits were transferable to a different vessel. Moreover, American Pelagic does not argue that it had the authority to effect a transfer of its permits to future owners of the
 
 Atlantic Star.
 
 It asserts only that future owners of the same vessel could apply for the same permits held by American Pelagic, and if they qualified, the permit numbers would stay the same and remain with the vessel.
 

 [15]
 

 . It is undisputed that American Pelagic had a property interest in the
 
 Atlantic Star. See Am. Pelagic I,
 
 49 Fed. Cl. at 46. However, American Pelagic does not contend that the
 
 Atlantic Star
 
 itself was taken by the revocation of its permits and authorizations. In fact, as the trial court explained, "the owner was left with the ship; it was not physically taken. Instead, restrictions merely were placed on its use.”
 
 Id.
 
 Thus, American Pelagics main contention, as stated in its complaint, was that the revocation of its permits and authorizations took from it the right to use the
 
 Atlantic Star
 
 to fish for Atlantic mackerel and herring in the EEZ.
 

 [16]
 

 . The Court explained:
 

 [0]ur “takings” jurisprudence ... has traditionally been guided by the understandings of our citizens regarding the content of, and the States power over, the “bundle of rights” that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "as long recognized, some values are enjoyed under an implied limitation and must yield to the police power.”
 
 Pa. Coal
 
 
 *1377
 

 Co. v. Mahon,
 
 260 U.S. [393,] 413, 43 S.Ct. 158, 67 L.Ed. 322 [(1922)].
 

 Lucas,
 
 505 U.S. at 1027, 112 S.Ct. 2886.
 

 [17]
 

 . To date, the United States has not ratified UNCLOS.
 

 [18]
 

 . American. Pelagic points to the text of 43 U.S.C. § 1332(1), (2) (2000), which provides the United States with “jurisdiction, control, and power of disposition" over the subsoil and seabed of the outer Continental Shelf that underlies the waters of the EEZ. The statute states that "the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected....” Outer Continental Shelf Lands Act, Pub.L. No. 212, ch. 345, §§ 2(a), 3(b), 67 Stat. 462, 462 (1953) (codified as amended at 43 U.S.C. § 1332) ("OCS-LA”). Citing
 
 Massachusetts v. Andrus,
 
 594 F.2d 872 (1st Cir.1979), American Pelagic contends that the Magnuson Act did not abrogate this congressional recognition of the right to fish in the EEZ. However, because it was enacted in 1953, more than twenty years prior to enactment of the Magnuson Act, OCSLA's intention not to affect the then-existing rights to navigation and fishing does not bear on the subsequent effect of the Magnuson Act. Moreover, the court in
 
 Massachusetts v. Andrus
 
 was not faced with the question of whether a property right to fish in the EEZ existed, but with the question of whether the Secretary of the Interior had authority to permit the sale of oil drilling leaseholds off the coast of New England. In
 
 dicta,
 
 the court did state that it was "unable to see that [the Magnuson Act] altered the meaning and purpose of [42 U.S.C. section 1332(2)], which had been directed at the legal right to fish rather than at prohibiting physical impediments." 594 F.2d at 889. Yet, the court also stated that the Magnuson Act is "thus no less an assertion of a federal interest in conserving the fishery resources in the waters of the Outer Continental Shelf than was the earlier Outer Continental Shelf Lands Act an assertion of a federal interest in developing the oil and gas wealth of the subsoil and seabed in the same area.”
 
 Id.
 
 at 891. We do not think that OCSLA and
 
 Massachusetts v. Andrus
 
 help American Pelagic.
 

 [19]
 

 . American Pelagic also points to the statement in the fact sheet accompanying Proclamation No. 5030 that "The President has not changed the breadth of the United States territorial sea.” American Pelagic’s reliance on this statement is misplaced. The EEZ, as stated in Proclamation No. 5030, is an area "beyond the territory and territorial sea of the United States,” 48 Fed.Reg. at 10,606, that now extends to twelve nautical miles from the baseline of the United States. Proclamation No. 5298, 54 Fed.Reg. 777 (Dec. 27, 1988). Even assuming it is to be accorded any measure of authoritative force, the statement in the fact sheet simply does not pertain to the assumption of sovereignty over fisheries in the EEZ pursuant to the Magnuson Act.
 

 [20]
 

 . The claimants in
 
 Andrus
 
 contended that federal regulations prohibiting the sale of parts of birds that were legally killed before the birds were protected by federal statute effected a taking of their bird artifacts.
 
 Andrus, 444
 
 U.S. at 64, 100 S.Ct. 318. The Supreme Court disagreed:
 

 The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle” of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety. In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds.
 

 Id.
 
 at 65-66, 100 S.Ct. 318. The Court went on to explain that the fact that the regulations prevented the most valuable use of the claimants’ property was not dispositive, and that a reduction in the value of property does not necessarily amount to a taking.
 
 Id.
 
 at 66, 100 S.Ct. 318. The Court stated that the loss of future profits, in the absence of any physical property restriction, "provides a slender reed upon which to rest a takings claim.”
 
 Id.
 

 [21]
 

 . American Pelagic argues that
 
 Maritrans, Inc. v. United States,
 
 342 F.3d 1344, supports its assertion of a property interest in the right to fish for Atlantic mackerel and herring in the EEZ. We do not agree.
 
 Maritrans
 
 involved a statute requiring,
 
 inter alia,
 
 that all single hull tank vessels, including tank barges, engaged in the marine transportation of oil and petroleum products in the navigable waters of the United States be either retrofitted with double hulls or phased out of service. The plaintiff, Maritrans, Inc. (“Maritrans") alleged that the statutory requirement constituted a taking of eight of its single hull tank barges that it had either retrofitted, scrapped, or sold as a result of the legislation.
 
 Id.
 
 at 1348-50. Addressing the threshold inquiry of whether Maritrans possessed a properly interest in its barges, we held that it did.
 
 Id.
 
 at 1353. We did not hold, however, that Mari-trans had a property interest in the use of its vessels on the navigable waters of the United States. Although we noted the governments contention that the property interest Mari-trans asserted was the use of its vessels on the navigable waters of the United States,
 
 id.,
 
 we did not approach the case in terms of such an asserted interest. Rather, we explained that like Mr. Conti, Maritrans had a property interest in the vessels themselves.
 
 Id.
 
 ("Martirans has various rights in its barges that qualify them as property for Fifth Amendment purposes.”). We then determined that the legislation did not effect a categorical taking of Maritrans vessels,
 
 id.
 
 at 1353-55, and further, pursuant to the
 
 Penn Central
 
 analysis, that Maritrans did not suffer a noncategorical taking of its vessels,
 
 id.
 
 at 1356-59.